**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on March 24, 2011, which may be different from its entry on the record.**

**IT IS SO ORDERED.**



_____

**Arthur I. Harris**
**United States Bankruptcy Judge**

**Dated: March 24, 2011**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TRACY L. QUARM, | ) | Chapter 7 Case No. 09-20498 |
|     Debtor. | ) | |
| _____ | ) | _____ |
| | ) | |
| JOHN WALLACE YOUNG, | ) | Chapter 7 Case No. 10-11404 |
|     Debtor. | ) | |
| | ) | Judge Arthur I. Harris |

MEMORANDUM OF OPINION[1]

    These two chapter 7 cases are currently before the Court on motions by the

United States Trustee ("U.S. Trustee") seeking the disgorgement of attorney's fees

the debtors paid to Persels & Associates, LLC ("Persels & Associates") and other

relief.  The U.S. Trustee contends that disgorgement is appropriate primarily

because the bankruptcy work performed by Persels & Associates' lawyers

constituted the unauthorized practice of law and because Persels & Associates did

---

[1] This opinion is not intended for official publication.

not adequately disclose its attorney's fees as required under 11 U.S.C. § 329 and Bankruptcy Rule 2016(b). For the reasons that follow, the U.S. Trustee's motions are granted in part and denied in part. Persels & Associates is ordered to make a partial disgorgement of attorney's fees in the amount of $700 to Quarm and $300 to Young.

## JURISDICTION

The Court has jurisdiction over the U.S. Trustee's motions pursuant to 28 U.S.C. § 1334(b) and Local General Order No. 84, entered on July 16, 1984, by the U.S. District Court for the Northern District of Ohio. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), as a motion seeking disgorgement of fees pursuant to 11 U.S.C. § 329 is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *See In re Wolverine Radio Co.*, 930 F.2d 1132, 1144 (6th Cir. 1991).

## PROCEDURAL BACKGROUND

On March 4, 2010, the U.S. Trustee filed a motion in the case of Tracy L. Quarm, seeking review under 11 U.S.C. § 329 of services rendered and fees paid to Persels & Associates and an order requiring disgorgement of excessive fees. On May 3, 2010, the U.S. Trustee filed an amended motion. On May 10, 2010, the U.S. Trustee filed a similar motion seeking the disgorgement of attorney's fees

paid to Persels & Associates in the chapter 7 case of John Wallace Young. The Court scheduled an evidentiary hearing for July 21, 2010, in the *Quarm* case and for September 15, 2010, in the *Young* case; however, the hearing dates in both cases were postponed at the request of the parties until December 2010.

On December 8-9, 2010, the Court conducted a combined evidentiary hearing in both cases. The Court heard testimony from the debtors, Tracy Quarm and John Young; the lawyers of record for the two debtors, Kathleen Donnelly and Gregory Freeman; the head of the bankruptcy practice for Persels & Associates, William Grafton; and two expert witnesses for Persels & Associates, Richard Koblentz and Michael Moran. By agreement, the Court also received the deposition testimony of the U.S. Trustee's expert witness, Nancy Rapoport, and the deposition testimony of two lawyers for Persels & Associates, Jerry Wild and Sarah Wyngaard.

The Court also received the following exhibits without objection: U.S. Trustee Exhibits 1-4, Exhibit 6 (p. 3 of 3 only), 7-9, 11, 13, 15, 17-25, 28, and 29 in the *Quarm* case; U.S. Trustee Exhibits 1-21, 23, 24, 28, 29, and 30 in the *Young* case; and Persels & Associates Exhibits A, B, D-K, and M for both cases.

The court deferred ruling on one exhibit – Rapoport's expert report (U.S. Trustee Exhibit 27 in both the *Quarm* and *Young* cases) – and asked the

3

parties to brief the issue of whether Rapoport had expressly incorporated her written statements during her sworn deposition testimony. Upon further reflection, the Court concludes that the report itself should not be admitted, even though Rapoport's testimony incorporated the findings contained in her report. *See Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) (district court erred in concluding that written opinions in expert report were admissible under Rules 702 and 703 of the Federal Rules of Evidence). Therefore, the Court will not receive the Rapoport report into evidence, although her deposition testimony and the expert opinions contained in her testimony are evidence.

STATEMENT OF FACTS

Pursuant to Bankruptcy Rule 9014(c) and Bankruptcy Rule 7052, the Court makes the following findings of fact. These findings of fact reflect the Court's weighing of evidence, including consideration of the credibility of the witnesses. "In doing so, the court considered each witness's demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court has considered the testimony of all the witnesses, as well as all exhibits admitted into evidence.

4

Persels & Associates is a law firm that runs a debt settlement practice, which consists of 80 to 90 percent of its business, and a bankruptcy practice, which consists of 5 to 10 percent of its business. (Tr.[2] at 201). Persels & Associates' letterhead, which is used in correspondence with clients, says: "Persels & Associates, LLC/ A National Law Firm Dedicated to Consumer Rights." (Ex. M at 596; Young Ex. 5, 9). Persels & Associates has only one physical business location, in Towson, Maryland. (Tr. at 197). A large number of Persels & Associates' lawyers and paralegals work remotely from different locations throughout North America. (Tr. at 200). It also appears that the vast majority of these lawyers and paralegals are not "employees" of Persels & Associates, but rather independent contractors. (Ex. 29 at 12; Quarm Ex. 23; Wyngaard Dep. at 54; Tr. at 304). Persels & Associates' lawyers and paralegals provide "unbundled legal services," including debt settlement, prosecuting federal Fair Debt Collection Practices Act claims, and helping clients file for bankruptcy. (Tr. at 197). William Grafton, who works on-site at the office in Maryland, oversees Persels & Associates' bankruptcy practice. (Tr. at 194, 201). Grafton is admitted to the state bars of Mississippi and Texas and the U.S. District Court for the Southern District

_____

[2] Unless otherwise noted, all citations to the Transcript refer to the Court's proceedings on December 8-9, 2010.

of Mississippi. (Tr. at 194, 201). Grafton testified that Persels & Associates does not advertise, but obtains clients through non-exclusive referrals from Care One Credit and EFA Processing, which provide debt management services, consumer credit counseling, and debt settlement services. (Tr. at 203). Neither the U.S. Trustee nor Persels & Associates offered much evidence as to the interrelationship between Persels & Associates and these entities which referred clients to the law firm.

*Debt Settlement Representation*

In a debt settlement representation form given to clients, Persels & Associates states that "its goal in debt settlement representation is to negotiate a settlement of all [the client's] enrolled unsecured debts in amounts [the client] can afford over the course of the representation" and that "debt settlement representation is designed for individuals who can no longer pay their debts and want to avoid bankruptcy, if possible." (Ex. M, Young Ex. 5). Persels & Associates also discloses that "no creditor has to accept a settlement for less than the full amount owed." (Ex. M, Young Ex. 5).

As part of its unbundled debt settlement legal representation, Persels & Associates contracts with local lawyers, designated "field attorneys," who are responsible for reviewing clients' files at least once a month, answering legal

6

questions, and drafting legal papers (*e.g.*, answers to collection lawsuits) that clients then sign and file on their own. (Ex. 29 at 25, 35-36) . Field attorneys communicate with clients by phone or over the Internet and never represent clients in court. (Ex. 29 at 17). For example, Jerry Wild, a lawyer admitted to practice in Ohio and Kentucky, works as an independent contractor for Persels & Associates. (Ex. 29 at 7, 105). Wild has about 550 active files with Persels & Associates. (Ex. 29 at 44). Wild currently receives $12 per file per month from Persels & Associates. (Ex. 29 at 24). In 2009, Wild received about $80,000 - $90,000 from Persels & Associates. (Ex. 29 at 97).

When debt settlement with their creditors fails, some clients decide to file bankruptcy. Persels & Associates' bankruptcy clients are almost exclusively clients of the law firm's debt settlement practice. (Tr. at 203).

### Initial Bankruptcy Consultation

Initially, when clients indicate they may wish to file bankruptcy, Persels & Associates' lawyers provide a bankruptcy consultation. Bankruptcy consultations are used to gauge whether an existing client is interested in moving forward with the bankruptcy or wants to try to continue to negotiate with creditors and finish the debt settlement representation. (Tr. at 208). The bankruptcy consultation includes a review of the client's rights under the Bankruptcy Code, of both chapters 7 and

7

13, of the differences between the chapters, and of whether the client would qualify for chapter 7 under a median income analysis. (Tr. at 208, 216). Three Persels & Associates' lawyers currently conduct bankruptcy consultations, including Sarah Wyngaard, who is licensed to practice in Alaska and Wisconsin and resides in Mexico. Bankruptcy consultations are provided over the telephone to clients and never face-to-face. (Tr. at 210). Persels & Associates pays its lawyers $18.50 for each bankruptcy consultation. (Tr. at 211).

After the bankruptcy consultation, if Persels & Associates determines that the client is better off filing a chapter 13, then the client is referred to local counsel because Persels & Associates does not handle any chapter 13 filings. (Tr. at 216). An estimated 20 to 30 percent of clients who receive bankruptcy consultations retain Persels & Associates to file their bankruptcy. (Tr. at 217). Persels & Associates represented approximately 300 clients filing bankruptcy in 2010. (Tr. at 212).

*Bankruptcy Retainer*

If Persels & Associates determines that a client can file chapter 7 under a median income analysis and the client retains Persels & Associates, then Persels & Associates' paralegals prepare a chapter 7 bankruptcy petition for that client. Petition-preparation done by Persels & Associates' paralegals is often supervised

8

by the bankruptcy audit attorney or by Grafton. (Wyngaard Dep. at 44-45; Tr. at 221). Numerous calls and emails occur between the paralegal and the client in order to gather the necessary information for the chapter 7 petition. After a draft petition is completed, a Persels & Associates' lawyer performs a bankruptcy audit, in which the lawyer reviews the draft petition with the client. (Tr. at 213). This process includes gathering last minute details from the client and correcting any mistakes the paralegal might have made. (Tr. at 213). The audit attorney also checks to make sure that the assets and creditors listed are indeed the client's assets and creditors and that duplicate creditors are not listed. (Tr. at 213). Two lawyers employed by Persels & Associates do bankruptcy audits, including Wyngaard and Kara Plunkett; Plunkett is licensed in Florida and resides in Tennessee. (Tr. at 213-14). Persels & Associates pays its lawyers $150.00 for each bankruptcy audit. (Tr. at 215). The bankruptcy audit is the final step before Persels & Associates hands the petition over to a local "filing attorney" for review and filing. (Tr. at 213). Wyngaard estimates that in the 2.5 years she has worked for Persels & Associates, she has conducted 50 to 75 bankruptcy consultations and/or audits in Ohio, and over 2000 bankruptcy consultations and/or audits nationwide. (Wyngaard Dep. at 23-24).

No Persels & Associates' lawyers are admitted to practice in the

U.S. District Court for the Northern District of Ohio. At the time Persels & Associates represented Tracy Quarm and John Young, no Persels & Associates' lawyers overseeing bankruptcy work had been admitted *pro hac vice* to the U.S. District Court for the Northern District of Ohio.

In order to file the bankruptcy cases for Quarm and Young, Persels & Associates entered into agreements with local lawyers, also referred to as "filing attorneys." These lawyers are admitted to practice both in Ohio and in the U.S. District Court for the Northern District of Ohio. Each local lawyer was responsible for conducting a final review of the bankruptcy petition, getting the client's signature for the petition, filing the petition, and attending the 341 meeting of creditors.

QUARM FACTS

Tracy Quarm resides in Mentor, Ohio, with her fiancé Terry Gaskins. Gaskins located Persels & Associates' website on the Internet and contacted the law firm for debt consolidation. For four months, until Quarm began to receive garnishment letters, Persels & Associates withdrew money from Quarm and Gaskins's checking account to pay off creditors. After Quarm and her fiancé contacted Jerry Wild and told him about the garnishment letters, Quarm decided to consider filing for bankruptcy. (Tr. at 29).

*Quarm's Initial Bankruptcy Consultation*

Quarm and Persels & Associates entered into an "Initial Consultation Agreement," which provided in pertinent part:

> Today, I [Tracy Quarm] am arranging to speak to an attorney from Persels & Associates, LLC for an initial Bankruptcy Consultation.
>
> I was advised that the Law Firm is a Debt Relief Agency as defined in the Federal Bankruptcy Code and that the law firm helps people file Bankruptcy relief under the Bankruptcy Code.
>
> I understand and agree that the Law firm provides ONLY these services for the consultation:
>
>     * A description of the relief available, and the benefits and the risks of filing for Bankruptcy relief under sections 7, 13, 11, and 12 of the Bankruptcy Code.
>
>     * An analysis, based upon the information and documents that I have provided to the firm, of my income, expenses, assets and liabilities. I understand that this analysis is only preliminary, because I did not provide for this initial consultation all of the information and documents that will be required to fully evaluate my situation.
>
>     * If it has appeared from the analysis that Bankruptcy may be an appropriate option for me, a discussion of the information and documents I will need for my Bankruptcy. If it has appeared from today's analysis that Bankruptcy may not be the appropriate alternative for me, a discussion of other possible alternatives.
>
>     * If it has appeared from the analysis that Bankruptcy may be an appropriate option for me, and I choose to hire this Law Firm, the Law firm will mail to me a copy of the Bankruptcy

11

Retainer Agreement, which I must sign and return promptly.

. . . .

I have been informed, understand and agree: The Law Firm is not offering to provide or willing to provide any services of Bankruptcy assistance to me at this time, other than specifically stated in this Agreement.

The only offer the Law firm will make to me to provide any services or Bankruptcy assistance other than specifically stated in this Agreement will be provided by a separate Retainer Agreement. I must make an appointment with an attorney of the Law Firm for my initial consultation. After my initial consultation I understand that I must enter into a Retainer Agreement with the Law Firm before the Law Firm will offer to provide or provide any other services or Bankruptcy assistance beyond what I have received.

(Quarm Ex. 7 at 4). Quarm signed the agreement on July 14, 2009. Wyngaard

conducted the initial bankruptcy consultation with Quarm by telephone. (Tr. at 36;

Wyngaard Dep. at 8-9). Wyngaard stated that "in every consultation" including

with respect to Quarm's bankruptcy consultation, "I always . . . tell every client

specifically where I am licensed." (Tr. at 40). Wyngaard also said that she is

"very clear with clients about" the fact that they will need to have a local filing

attorney. (Tr. at 40-41). As a result of the initial bankruptcy consultation, Quarm

decided to enter into a retainer agreement with Persels & Associates for the

purpose of filing a chapter 7 bankruptcy case.

12

*Quarm's Bankruptcy Retainer Agreement*

On July 17, 2009, Quarm entered into a bankruptcy retainer agreement with Persels & Associates. Although the bankruptcy retainer agreement admitted into evidence was missing the first two pages, the services that Persels & Associates agreed to provide included the following:

3.  Consult with Client to discuss your financial situation and possible solutions;

4.  Provide the section 342(b)(1) notice, (attached hereto as exhibit B) which sets out the purpose, benefits and costs of filing under Chapters 7, 11, 12 or 13; the types of services available from credit counseling agencies; and the penalties of committing certain bankruptcy crimes, and will explain the notice to you;

5.  Prepare the necessary bankruptcy petition, schedules, statement of affairs, and other documents, and review and file your bankruptcy;

6.  Take calls from and correspond with Client(s) creditors as appropriate. Client(s) and Attorney agree that this service will continue post-filing and Attorney will notify creditors telephonically for a reasonable period after the filing.

7.  Advise and counsel Client(s) in regard to Chapter 7 bankruptcy action.

8.  Prepare all court papers on Client(s)' behalf necessary to commence Client(s)' Chapter 7 including:
    A.  Chapter 7 Petition;
    B.  Schedules; and
    C.  Automatic Stays to certain creditors.

9.  Provide post-petition representations to Client(s) in conjunction with Client(s)' Chapter 7 Petition from filing through discharge date

13

subject to the following list:

    a.      An attorney will appear with Client(s) at the 341 meeting of creditors;

    b.      An attorney will prepare any necessary amendments to the Petition and Schedules after the 341 meeting of creditors, except for the addition of creditors which were not listed in the initial filing, or changes required due to incorrect or incomplete information being provided to the Law Firm.

    c.      An attorney will advise you and respond where appropriate to any correspondence, calls' and letters from creditors and other entities.

(Quarm Ex. 8 at 3). Persels & Associates initially quoted Quarm a total bankruptcy fee of $1,999, which included attorney's fees of $1,500, a filing fee of $299, and $200 in expenses for a credit report, tax transcripts (if necessary), pre-filing credit counseling, and post-filing debtor education. (Quarm Ex. 6 at 2). Persels & Associates later reduced the attorney's fees to $1,400 and refunded $100 to Quarm. (Quarm Ex. 7 at 2).

        The retainer agreement expressly excluded a number of legal services from the flat bankruptcy fee. Among the unbundled legal services excluded from the flat fee charged by Persels & Associates were the following services, some of which were available for additional charges as noted below:

- objections to the dischargeability of a debt;

- defending motions to lift the automatic stay;

- examination of the debtor under Rule 2004;

14

- amendments to add creditors ($200 per amendment, not including additional court filing fee)

- motion to avoid a judgment lien (minimum $400 additional fee); and

- review of reaffirmation agreements ($200 per reaffirmation agreement).

(Quarm Ex. 8 at 4-5). Nor does it appear that the initial fee included filing a motion to redeem under 11 U.S.C. § 722. (Quarm Ex. 8 4-5).

In the representation agreement, Quarm initialed that she understood that her bankruptcy:

> may be filed by an attorney acting as "Of Counsel" to Persels & Associates, LLC or by an independently contracted attorney. In the event that an independently contracted attorney or "Of Counsel" attorney cannot be located for the filing of client's bankruptcy petition, then Persels & Associates, LLC may refer the client's file directly to local counsel for assistance and filing.

(Quarm Ex. 8 at 5). Quarm also initialed that she understood and agreed that Persels & Associates "may have more than one associate attorney assist in filing [her] petition and appear at the meeting of creditors on [her] behalf." (Tr. at 35).

Although the bankruptcy retainer agreement did include a disclaimer that Quarm's bankruptcy may be filed by an attorney acting as "of counsel" to Persels & Associates or by an independently contracted attorney, the agreement failed to disclose that, at the time Persels & Associates agreed in writing to represent Quarm in the preparation, filing, and prosecution of her bankruptcy case, no one at Persels

15

& Associates was admitted to practice in the U.S. Bankruptcy Court for the Northern District of Ohio. Nor did anyone at Persels & Associates orally advise Quarm of this important fact.

After Quarm signed the bankruptcy retainer agreement, she had no further contact with attorney Wild. Nor did Wild communicate with anyone else regarding Persels & Associates' bankruptcy representation of Quarm until he received a subpoena from the U.S. Trustee. "I don't have anything to do with [these] bankruptcies. I didn't even know the clients had filed bankruptcy until [the U.S. Trustee's] subpoena arrived." (Ex. 29 at 103).

Between July and September, 2009, Quarm communicated with paralegals and other non-lawyers at Persels & Associates, who drafted her bankruptcy petition, schedules, and statements. On September 24, 2009, Quarm had a telephone conversation with attorney B. Valerie Carullo regarding her chapter 7 draft bankruptcy filings. This was the bankruptcy audit. (Tr. at 41). Carullo is an attorney licensed in Florida that Grafton hired to conduct a few bankruptcy audits for Persels & Associates from the summer of 2009 to January 2010. (Tr. at 235-36).

Persels & Associates' employees are supposed to log every contact with the client and also all calls and contacts made on the client's behalf. In Persels &

16

Associates' entry log, Carrullo noted several discussions with both Quarm and Gaskins regarding the petition. The first notation, made September 24, 2009, and written by "BVC" stated that Carullo had reviewed the petition and supporting documents in preparation for a scheduled audit and that:

> Because client has a live in boyfriend of over one year, his income must be considered for purposes of the means test. Spoke with client to inquire about division of household expenses. She explained that they share a checking account into which they deposit their paychecks and pay all household expenses from that one account. I advised that means test would have to be recalculated to include her boyfriend's income and that Schedule J would be adjusted to reflect a 3 person household. The audit was rescheduled for 9/29/09 at 9:30 a.m. Client also advised that she had been served with a judgment and was requested to fax a copy to us asap. Based on the updated income information and Schedule J adjustment, client does not appear to pass the means test.

(Ex. B at 26). Carullo made other notations including: "based on current calculations, client passes the means test," "discussed credit counseling class and instructed her to complete it asap" and "after conducting the long form means, test, client's DMI is under abuse by $319.90, however, I still have to make some adjustments for Gaskin's 401k contributions, however, I need all of his paystubs to do so. I explained the means test and what it means for her that she is above median income." (Ex. B at 26-27). Carullo and Quarm engaged in several rounds of changes to the petition. In addition, Carullo requested various documents, such as checking account statements and payroll invoices, which Quarm provided.

17

(Ex. B. at 26-27).

*The Search for a Lawyer Admitted To Practice in the U.S. Bankruptcy Court for
the Northern District of Ohio*

When Quarm signed her bankruptcy retainer agreement with Persels &
Associates in July of 2009, no one at the law firm was admitted to practice in the
bankruptcy court where her bankruptcy case was to be filed. While Persels &
Associates had on several occasions previously contracted with Freeman for
bankruptcy services in the Northern District of Ohio, those services were on an
individual, case-by-case basis, with no obligation beyond the work contracted for
in each case. (Tr. at 313, 136-37). Persels & Associates asked Freeman if
Freeman was interested in serving as "filing attorney" for Quarm's case, but
Freeman declined. (Tr. at 136).

On October 20, 2009, Grafton sent an email solicitation to attorney Kathleen
Donnelly with the subject heading: "Looking for local counsel/filing attorney for
Chapter 7 bankruptcy case in Cleveland area." The email provided in pertinent
part:

> I am the Managing Bankruptcy Attorney for Consumer Law Associates, a
> law firm which is based out of Maryland. It is a nationwide law firm that
> concentrates in debtor representation and Chapter 7 bankruptcy filings (we
> refer our Ch. 13s out). We prepare our clients' bankruptcy petitions
> in-house and then send them out to a number of our staff/local/of counsel
> attorneys who then only have to do a review of the petition, physically file
> the paperwork (or electronically file, as the jurisdiction may require), and

18

attend the 341 meeting.

If you are interested, we have a client right now who is ready to be filed in the Cleveland area. It is a basic, simple Chapter 7 bankruptcy petition. All we need is a filing attorney in your area. I have the paperwork ready to go and the clients are anxious to get started with the filing.

The advantage for you is you will only have to do a review of the petition (especially the exemptions, for compliance with state law), perhaps make a phone call to the client or meet with the client at your discretion, file the papers, and then attend the 341 meeting. If you agree to act as the filing attorney on this case, we will immediately send you a check for $400 (plus a separate check for $299 for the filing fee) and the client's paperwork. The client has already taken the credit counseling course. We complete all due diligence on the file, including appraisals, lien searches, tax searches, etc. and we send copies of everything to you. The paperwork will be in final form, personally prepared and reviewed by me and gone over with the client. You will also get all supporting documentation for both the bankruptcy petition and in anticipation of what may be requested by the trustee for the 341 meeting, along with my attorney notes.

If you would like, I can also file a motion to enter the cases myself pro hac vice along with you.

Can you email me back to let me know if you are interested? We can discuss it more over the phone, if you have any questions. Thanks for your time. There will probably be more work like this to send your way in the future if you decide you are interested. We also refer all our Chapter 13s out to attorneys who have acted as filing attorneys for us (no charge), so that is an added incentive.

Regards,

William A. Grafton
Practice Manager
Persels & Associates, LLC

(Quarm Ex. 9 at 3).

19

Donnelly had no prior contacts with Persels & Associates and had not heard of Persels & Associates before receiving the email solicitation from Grafton. (Tr. at 51). After reviewing electronic versions of Quarm's draft petition, schedules, and statements, Donnelly agreed to accept the referral and signed a retention letter with Persels & Associates the same day. The one-page written agreement between Persels & Associates and Donnelly provides in pertinent part:

> 1. Client Tracy Quarm desires to file for Chapter 7 Bankruptcy, and has retained Persels & Associates, to assist her in this filing;
>
> 2. Debtors have agreed to pay and have paid Persels & Associates the fee of $1899, which includes the $299 filing fee and other associated costs [. . .];
>
> 3. Persels & Associates has prepared in coordination with the Debtors, a substantially completed draft of the Chapter 7 Bankruptcy Petition and supporting Schedules, which have been reviewed and approved by the Debtor;
>
> 4. Persels has agreed to pay, and Kathleen Donnelly has agreed to accept, the sum of $400 for the final review of Debtor's Chapter 7 Petition and supporting schedules and any necessary supporting documents, coordination with the Debtors in obtaining their signature, filing of the Chapter 7 Petition and supporting schedules, and attendance at the Sec. 341 meeting of creditors. Persels will provide Kathleen Donnelly with the funds to pay the filing fee; *Ms Donnelly reserves right to charge additional fees for additional services as outlined in attached Consultation Agreement. KD*
>
> 5. For the Purposes of this and future work, Kathleen Donnelly has agreed to act as Of Counsel to the firm.

(Quarm Ex. 6 at 3). (Italicized language was handwritten by Donnelly).

Quarm understood that Donnelly was an attorney and that Donnelly would

20

file her petition in the U.S. Bankruptcy Court for the Northern District of Ohio. (Quarm Ex. 6 at 3). After Donnelly took Quarm's case, Quarm never spoke with anyone else at Persels & Associates. Persels & Associates paid Donnelly for her services from the retainer fee Quarm paid to Persels & Associates. The bankruptcy petition that was ultimately filed included notations that the attorney's fees would be divided, with Persels & Associates paying $400 of its $1,400 to Donnelly (Quarm Ex. 2, Petition at 33, 41). Donnelly analyzed Quarm's financial circumstances, advised her of her bankruptcy and non-bankruptcy options, and discussed the option of not filing for bankruptcy. (Tr. at 44).

Quarm came to Donnelly's office on November 4, 2009. Quarm signed a separate consultation agreement with Donnelly. Donnelly reviewed Quarm's petition, schedules, and statements, made some changes, and filed Quarm's chapter 7 petition the same day while Quarm was in Donnelly's office. Donnelly gave Quarm a copy of the petition, the consultation agreement, the notice of bankruptcy filing with seal, and a copy of the docket showing the 341 meeting and time. (Quarm Ex. 9). On February 16, 2010, Quarm received a chapter 7 discharge. (Quarm Ex. 1 at 3).

## YOUNG FACTS

John Young resides in Parma, Ohio. Young initially found Persels &

Associates on the Internet. (Tr. at 128).  In November, 2008, Young entered into a debt settlement program with Persels & Associates, in which Persels & Associates sent cease and desist letters to creditors and tried to settle debts with his creditors. (Ex. K at 760).  Persels & Associates withdrew $300 to $400 monthly from Young's checking account. (Tr. at 96, 98).  Young agreed to pay a legal fee of $4,617.00 to Persels & Associates over the first 18 months of the representation. (Young Ex. 5 at 3).  Persels & Associates settled one debt for Young with Palisades Collection in June, 2009. (Ex. K at 756).

In August, 2009, HSBC Bank Nevada sued Young in state court on a $1,400 debt.  (Ex. K at 754).  Persels & Associates assigned Wild, a Persels & Associates "field attorney," to advise Young about the lawsuit.  Wild is licensed to practice in Ohio and Kentucky and resides in the Cincinnati area.  (Tr. at 103).  Wild drafted a response to the complaint (Young Ex. 7; Tr. at 104) and a letter to HSBC's counsel (Young Ex. 8; Tr. at 122), but these documents were not signed by Wild in his capacity as Young's attorney, and instead were offered as a *pro se* response and a letter from Young.  Wild and Young never met face-to-face.  (Tr. at 105).  Wild did not make any court appearances on Young's behalf.

Employees of Persels & Associates are supposed to log every contact with the client and also all calls and contacts made on the client's behalf.  On

September 21, 2009, an entry for Young's account stated: "client called to find out status of negotiations for HSBC . . . going to court on 9/23/09."  (Ex. K at 749). On September 22, 2009, an entry stated: "Client called to speak with FA [field attorney] for hearing tomorrow. FA not avail. Sent email."  (Ex. K at 748).  On September 29, 2009, an entry stated: "client had several complaints about attorney, said that creditors attorney told him court answers were incorrect – 'not in legal format' – offered to transfer him to P&A to have new attorney assigned – declined – advd him that program does not include attorney appearing in court with him." (Ex. K at 746).  On September 30, 2009, HSBC accepted the settlement offer. (Ex. K at 745).

In October, 2009, Young decided to consider filing for bankruptcy.  (Ex. K at 744).  Wyngaard went over the initial bankruptcy consultation agreement with Young, which he initialed and signed October 7, 2009 (Tr. at 107; Young Ex. 9). The bankruptcy consultation agreement that Young signed is identical in form to the one previously described involving Quarm.  On October 10, 2009, Wyngaard called Young for a bankruptcy consultation  (Ex. K at 744).  On October 17, 2009, Young entered into a bankruptcy retainer agreement with Persels & Associates, which provided in pertinent part:

1. Client(s) agrees to pay the following:

23

A. The Court filing fee of $299
B. An attorney fee of $1499 subject to court approval
C. Costs payable by the attorney on behalf of the client totaling $200
D. [Discloses how funds are held by firm]
E. The total amount due is $1998.00 to be paid on or before six months from the date retainer is signed

2. Client(s) understands that attorney is not retained until retainer fee is paid. Client further understand that attorney cannot proceed until the questionnaire is completed and returned.

Persels & Associates agrees to perform the following services:

3. Consult with Client to discuss your financial situation and possible solutions;

4. Provide the section 342(b)(1) notice, (attached hereto as exhibit B) which sets out the purpose, benefits and costs of filing under Chapters 7, 11, 12 or 13; the types of services available from credit counseling agencies; and the penalties of committing certain bankruptcy crimes, and will explain the notice to you;

5. Prepare the necessary bankruptcy petition, schedules, statement of affairs, and other documents, and review and file your bankruptcy;

6. Take calls from and correspond with Client(s) creditors as appropriate. Client(s) and Attorney agree that this service will continue post-filing and Attorney will notify creditors telephonically for a reasonable period after the filing.

7. Advise and counsel Client(s) in regard to Chapter 7 bankruptcy action.

8. Prepare all court papers on Client(s)' behalf necessary to commence Client(s)' Chapter 7 including:
A. Chapter 7 Petition;

24

> B. Schedules; and
>
> C. Automatic Stays to certain creditors.
>
> 9. Provide post-petition representations to Client(s) in conjunction with Client(s)' Chapter 7 Petition from filing through discharge date subject to the following list:
>
>> a. An attorney will appear with Client(s) at the 341 meeting of creditors;
>>
>> b. An attorney will prepare any necessary amendments to the Petition and Schedules after the 341 meeting of creditors, except for the addition of creditors which were not listed in the initial filing, or changes required due to incorrect or incomplete information being provided to the Law Firm.
>>
>> c. An attorney will advise you and respond where appropriate to any correspondence, calls' and letters from creditors and other entities.

(Young Ex. 9b at 2-3). Also in the representation agreement, Young initialed that

he understood that his bankruptcy:

> may be filed by an attorney acting as "Of Counsel" to Persels & Associates, LLC or by an independently contracted attorney. In the event that an independently contracted attorney or "Of Counsel" attorney cannot be located for the filing of client's bankruptcy petition, then Persels & Associates, LLC may refer the client's file directly to local counsel for assistance and filing.

(Young Ex. 9b at 5).

On January 13, 2010, Wyngaard conducted Young's bankruptcy audit.

(Ex. K at 741). On January 17, 2010, Wyngaard emailed Young asking him to

review the draft petition, but telling him not to sign the petition yet since she was

"waiting to hear back from your filing attorney regarding specific requirements

25

found in your filing jurisdiction." (Wyngaard Dep. at 14; Ex. D).

On January 18, 2010, Persels & Associates contracted with Gregory Freeman, an attorney from Akron, Ohio, to represent Young locally. (Young Ex. 10 at 1). Freeman is admitted to practice both in Ohio and in the U.S. District Court for the Northern District of Ohio. (Tr. at 130-31). His practice consists primarily of filing consumer bankruptcies. (Tr. at 131-32). Freeman acted as local "filing attorney" for Persels & Associates five times, filing two bankruptcy cases in 2008 and three cases in 2010, including the *Young* case. (Tr. at 133-34). In 2008, Freeman was contacted by Persels & Associates after he had posted an advertisement on Craigslist for filing chapter 7 petitions. (Tr. at 133). Persels & Associates paid Freeman $450 for his representation in Young's bankruptcy case. (Young Ex. 10).

Wyngaard and Freeman collaborated briefly on the petition by email and had one telephone conversation. On January 21, 2010, Wyngaard wrote:

> Greg, Thanks for calling me today to discuss the Petition. I had an opportunity to look it over briefly this afternoon and it appears that the Petition will be fine. I plan on going through the entire Petition and talking to Client in the morning and will provide an update then. Thanks again and I will talk to you soon.

(Wyngaard Dep. at 18; Ex. F). On or about January 27, 2010, Freeman called Young to set up a meeting. Freeman came over to Young's house to review the

petition and make sure that it complied with Ohio law. (Tr. at 112-13, 143).

Young never paid Freeman for his services, but understood that Persels &

Associates would be paying Freeman.  (Tr. at 113).  On February 15, 2010,

Wyngaard wrote an email to Freeman regarding the following issues:

> Dear Attorney Freeman, Please find the BestCase file for the Young Petition
> attached. Please find the below notes as follow-up, per our previous
> conversation regarding this Petition.
> 1) Debtor does not receive any income from the property that is in his name.
> Nobody is living in the property;
> 2) we do not have a copy of the Deed to Debtors property;
> 3) HH [household] of 2, once marital adjustment taken (married but filing
> individually; under median;
> 4) autos-2 vehicles are show[n] under 22A, but only 1 is taken under 23,
> because Clients name is not on title to W[ife']s auto and I used the marital
> adjustment to account for her auto payment
> 5) Non-filing Spouse has an auto payment and a monthly payment on a
> travel trailer.  These payments are reflected under marital adjustment;
> 6) Client has not filed 2009 taxes yet, exemption used for expected refund.

(Dep.sition Ex. H).

On February 25, 2010, Freeman filed Young's chapter 7 petition, schedules,

and statements.  (Young Ex. 12).  Freeman's edits to the petition drafted by Persels

& Associates' lawyers are handwritten on the petition.  (Young Ex. 12).  On the

Disclosure of Compensation Form, Freeman signed as "Of Counsel" to Persels &

Associates.  (Young Ex. 12 at 37).  The fee splitting arrangement between Freeman

and Persels & Associates was not readily apparent from the typed disclosure form;

however, Freeman did hand-write "400.00 paid to Greg Freeman 'of counsel' " on

27

the form. (Young Ex. 12 at 37). Freeman testified that he was actually paid $450. (Tr. at 146).

On June 4, 2010, the U.S. Trustee filed a motion to dismiss Young's case for abuse under 11 U.S.C. § 707(b)(3) based on the "totality of circumstances test." The U.S. Trustee argued that disposable income was available to fund a chapter 13 plan based on Young's Schedule J, which showed $611.47 per month going for rental property that Young intended to surrender. (Young Ex. 19). Freeman and Grafton briefly discussed the U.S. Trustee's motion by email. (Ex. G at 512-14). Freeman drafted a response, which he filed along with an amended Schedule J on June 14, 2010. (Young Ex. 21). On July 15, 2010, the U.S. Trustee withdrew its motion to dismiss, and on August 4, 2010, Young received a chapter 7 discharge.

*Expert Testimony*

Richard Koblentz and Nancy Rapoport offered expert testimony on what constitutes the unauthorized practice of law under Ohio law. Koblentz is admitted to practice both in Ohio and in the U.S. District Court for the Northern District of Ohio. (Tr. at 401). Koblentz has served on the Grievance Committee of the Cuyahoga County Bar Association for 15 years and has represented lawyers in over 50 trials before the Grievance Committee. (Tr. at 403-03). Rapoport is a law professor at the University of Nevada Las Vegas and a renowned expert on ethics

28

issues.  Rapoport worked as an associate at Morrison & Foerster for five years specializing in bankruptcy before she became an assistant professor at the Ohio State University College of Law, at which time, she waived into the Ohio bar.  (Ex. 28 at 7, 17).

Koblentz testified that he believed the conduct of Persels & Associates' lawyers fell within the safe-harbor provisions of Rule 5.5 of the Ohio Rules of Professional Conduct because Persels & Associates' debt settlement practice was a nonlitigation activity, filing bankruptcies for clients in Ohio was reasonably related to Persels & Associates' debt settlement practice in those jurisdictions where Persels & Associates' lawyers were admitted, and actual litigation services were undertaken in association with lawyers who were admitted to practice before the bankruptcy court.  (Tr. at 411-12).

Rapoport testified that she believed the conduct of Persels & Associates' lawyers was the unauthorized practice of law because Persels & Associates was not associated first with an Ohio lawyer to be able to practice law in Ohio, the lawyers' practice was not temporary because the lawyers knew the debtors they would represent were Ohio debtors, and that, in consumer bankruptcy cases, the venue statute dictates that the petition is filed based on where the debtor resides.  (Ex. 28 at 23, 25, 27).

Rapoport and Koblentz often came to opposite conclusions in their opinions concerning the legal representation provided by Persels & Associates in these two cases. In general, the Court found Rapoport to be more familiar with bankruptcy law, and Koblentz more experienced with the legal ethics laws in Ohio. Both are well-respected and knowledgeable, and the Court benefitted from their respective opinions. While both witnesses have substantial expertise in the area of legal ethics, in the final analysis, the Court itself is responsible for determining the law of the case. *Cf. United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984) (trial court erred in permitting two attorneys and bankruptcy judge give opinion testify at jury trial as to the law regarding the payment of interim compensation to receivers). And while neither party objected to admitting the testimony of the opposing party's expert, the Court will largely treat the expert testimony as further briefing by the parties on the applicable law. The Court itself is responsible for determining the law of the case.

The Court also heard limited expert testimony from a local bankruptcy attorney, Michael Moran, about the range of fees typically charged for chapter 7 consumer bankruptcy cases filed in the U.S. Bankruptcy Court for the Northern District of Ohio.

## DISCUSSION

The U.S. Trustee asserts that the fees of Persels & Associates should be disgorged under 11 U.S.C. § 329 because the services performed constitute the unauthorized practice of law and because Persels & Associates did not accurately disclose its fee arrangements as required under 11 U.S.C. §329 and Fed. R. Bankr. P. 2016(b). If the U.S. Trustee is correct that the services did constitute the unauthorized practice of law, or that the fees were not accurately disclosed, case law would support the availability of disgorgement, notwithstanding the otherwise beneficial nature of the services and positive outcome for the debtors. *See Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 720 (6th Cir. 2001) (even if bankruptcy court had not determined that attorney's fees were excessive, disgorgement would still be within court's discretion in light of disclosure requirements of § 329 and Rule 2016(b)); *In re Wood*, 408 B.R. 841, 852-54 (Bankr. D. Kan. 2009) (disgorgement and denial of fees warranted when Kansas attorney associated with legal services organization that prepared filings using either non-lawyers or lawyers not licensed to practice law in Kansas or the district court); *In re Zuniga*, 332 B.R. 760, 789-91 (Bankr. S.D. Tex. 2005) (disgorgement of fees warranted when bankruptcy petition was filed by attorney not admitted to the federal bar); *In re Brown*, 270 B.R. 43 (Bankr. D. S.C. 2001) (disgorgement of

31

fees warranted when attorney not admitted to practice in South Carolina or the federal bar advised debtors about filing for bankruptcy relief and prepared petition and schedules); *see also In re Big Rivers Elec. Corp.*, 355 F.3d 415, 437 (6th Cir. 2004) (examiner who breached duty to remain disinterested was forced to disgorge entire fee, even though his efforts purportedly brought $145 million of new value into the estate).

If lawyers for Persels & Associates engaged in the unauthorized practice of law before this Court, sanctions may also be appropriate under the Court's inherent powers. *See, e.g.*, *Mapother & Mapother, PSC v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996) ("Bankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct.").

As explained more fully below, the Court ultimately concludes that lawyers for Persels & Associates did engage in at least some unauthorized practice of law in the preparation of the petition, schedules, and statements for Quarm and Young, and that this justifies at least a partial disgorgement of attorney's fees under 11 U.S.C. § 329. In reaching this conclusion, the Court acknowledges that the issues involved in this analysis are numerous and complex, and that legal experts and other courts may well reach different conclusions.

The Court further concludes that a partial disgorgement of attorney's fees

paid to Persels & Associates is warranted, irrespective of the Court's decision

regarding the purported unauthorized practice of law. The Court reaches this

conclusion under the broad authority granted for the review of attorney's fees for

reasonableness under 11 U.S.C. § 329 and Rule 2017. As explained more fully

below, partial disgorgement is appropriate in each of these two bankruptcy cases

because Persels & Associates failed to disclose to its client at the time of the

bankruptcy retainer agreement that no one in the law firm was admitted to practice

in the bankruptcy court where the bankruptcy case had to be filed. In addition,

partial disgorgement is warranted because of the resulting extra work, inefficiency,

and delay caused by this otherwise unnecessary duplication of effort.

*Applicable Law Governing the Practice of Law*

The Bankruptcy Code contains its own definition of attorney. "The term

'attorney' means attorney, professional law association, corporation, or

partnership, authorized under applicable law to practice law." 11 U.S.C. § 101(4).

*See Rittenhouse v. Delta Home Improvement, Inc. (In re Desilets)*, 291 F.3d 925,

930 (6th Cir. 2002). In *Desilets*, the Sixth Circuit addressed the question whether

the "applicable law" authorizing an attorney to practice before the bankruptcy

court consists solely of the federal rules for admission to the federal bar, or also

includes the state rules for admission to the state bar, even when not referenced in

33

the federal rules.

### In re Desilets

*Desilets* arose from a bankruptcy case filed in the U.S. Bankruptcy Court for the Western District of Michigan. A creditor moved for an order sanctioning the debtor's attorney, Allan Rittenhouse, for the unauthorized practice of law because he was not admitted to the bar of the State of Michigan. Rittenhouse was admitted to practice in Texas and in the U.S. District Court for the Western District of Michigan, but not in Michigan. Rittenhouse had an office in his home in Wisconsin and also had an office in Iron Mountain, Michigan. His practice was limited to bankruptcy matters in federal court. The bankruptcy court interpreted the local federal rules only to authorize practice in the court and not the practice of law. The bankruptcy court held that Rittenhouse was engaged in the unauthorized practice of law and indefinitely suspended him from appearing before the bankruptcy court. The district court affirmed.

On appeal, the Sixth Circuit reversed. The Sixth Circuit first noted that "federal courts have the right to control the membership of the federal bar." 291 F.3d at 929.

> "Congress has provided in 28 U.S.C. § 2071 that the district courts may prescribe rules for the conduct of their business. It is clear from 28 U.S.C. § 1654 that the authority provided in § 2071 includes the authority of a district court to regulate the membership of its bar." *Frazier v. Heebe*,

> 482 U.S. 641 (1987) (Rehnquist, dissenting). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (accord). The power to admit and regulate attorneys is not, as the *Peterson* court asserts, the sole bailiwick of the states.

*Id.* at 929-30. The Sixth Circuit then noted that the local rules governing the practice of law in the Western District of Michigan defined the practice of law more broadly than the bankruptcy court had interpreted it. In particular, the local rules authorized the attorney "to counsel a client in the action or proceeding for compensation." *Id.* at 930. The Sixth Circuit added:

> When state licensing laws purport to prohibit lawyers from doing that which federal law expressly entitles them to do, the state law must give way. *Sperry* [*v. Florida ex rel. the Florida Bar*, 373 U.S. 379, 385 (1963)].

*Id.* The Sixth Circuit concluded:

> Because Rittenhouse was properly admitted to the federal bar under the applicable rule, and because federal standards govern practice before the federal bar, we reject the bankruptcy court's determination as adopted by the district court.

*Id.* at 931. *Accord Surrick v. Killion*, 449 F.3d 520, 533-34 (3d Cir. 2006) (power of Eastern District of Pennsylvania to determine who may practice before it preempts Pennsylvania law barring an unlicensed attorney from maintaining a law office).

### *Rules Governing the Practice of Law in the Northern District of Ohio*

The U.S. Bankruptcy Court for the Northern District of Ohio is a unit of the U.S. District Court for the Northern District of Ohio. *See* 28 U.S.C. § 151. In

35

order to practice before the U.S. Bankruptcy Court for the Northern District of

Ohio a lawyer must be a member in good standing of the bar of the U.S. District

Court for the Northern District of Ohio. *See* N.D. Ohio Local Bankruptcy Rule

2090-1. In order to be admitted to practice in the U.S. District Court for the

Northern District of Ohio, lawyers must:

> have been admitted to practice in the highest court of any state, territory, the District of Columbia, an insular possession, or in any district court of the United States, that they are currently in good standing with such court and that their private and professional characters appear to be good. All attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct adopted by the Supreme Court of Ohio, so far as they are not inconsistent with federal law.

N.D. Ohio Local Civil Rule 83.5. Lawyers need not be admitted to the bar of the

State of Ohio to practice in the U.S. District Court for the Northern District of

Ohio.

Lawyers may also participate in an individual bankruptcy case or proceeding

on a *pro hac vice* basis:

> Any member in good standing of the Bar of any court of the United States or of the highest court of any state may, upon written or oral motion, be permitted to appear and participate in a case or proceeding.

N.D. Ohio Local Bankruptcy Rule 2090-1. The decision to permit an attorney to

practice on a *pro hac vice* basis "is committed to the sound discretion of the trial

judge." *DH Overmyer Co. v. Robson*, 750 F.2d 31, 33 (6th Cir. 1984).

36

In the present case, it is undisputed that, except for the two "filing attorneys" that Persels & Associates contracted with for the *Quarm* and *Young* cases, no lawyer from Persels & Associates was admitted to practice in the U.S. District Court for the Northern District of Ohio. Nor was it the practice of Persels & Associates' lawyers to seek admission on a *pro hac vice* basis in cases to be filed in U.S. Bankruptcy Court for the Northern District of Ohio. While Grafton did offer to seek admission on a *pro hac vice* basis, if necessary, in an email to Donnelly, Quarm Ex. 9 at 3, there is no indication that it was the practice of Persels & Associates to seek admission on a *pro hac vice* basis. Grafton did not seek admission on a *pro hac vice* basis in the *Young* case or in any of the other cases filed by Freeman. Grafton did seek and obtain admission on a *pro hac vice* basis in the *Quarm* case approximately seven weeks after the U.S. Trustee filed its motion seeking review and disgorgement of fees paid to Persels & Associates. This was after Quarm had received her discharge and at a time when the only issue remaining before the Court was the motion seeking review and disgorgement of fees paid to Persels & Associates.

*What Constitutes the Practice of Law in the Northern District of Ohio*?

Unlike the local rules for the Western District of Michigan at issue in *Desilets*, the local civil rules and local bankruptcy rules for the Northern District of

37

Ohio do not define the practice of law.  The closest local rule for the Northern

District of Ohio on point is the prohibition contained in Local Civil Rule 83.5(a):

> No person shall be permitted to practice in this Court or before any officer thereof as an attorney or to commence, conduct, prosecute, or defend any action, proceeding, or claim in which such person is not a party concerned, either by using or subscribing his or her own name or the name of any other person, unless he or she has been previously admitted to the Bar of this Court.

Also relevant to the definition of the practice of law in the Northern District of

Ohio is Local Civil Rule 83.7(a):

> *Standards for Professional Conduct.* Attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct adopted by the Supreme Court of the State of Ohio, so far as they are not inconsistent with federal law (see LR 83.5(b) and (f)).

Historically, the Ohio Supreme Court has applied a broad definition of what

constitutes the practice of law in Ohio:

> We have defined the practice of law expansively. In Ohio, the practice of law is not limited to the conduct of cases in court but embraces "the preparation of pleadings and other papers incident to actions," "the management of such actions," and "in general all advice to clients and all action taken for them in matters connected with the law." Land Title Abstract & Trust v. Dworken (1934), 129 Ohio St. 23, 1 O.O. 313, 193 N.E. 650, paragraph one of the syllabus.

*Cincinnati Bar Assn. v. Foreclosure Solutions, LLC*, 123 Ohio St. 3d 107, 110, 914

N.E.2d 386, 389 (2009).  Absent a specific definition of the practice of law in the

local rules for Northern District of Ohio, the Court believes that, consistent with

38

Local Civil Rules 83.5(b) and (f) and 83.7(a), what constitutes the practice of law in Northern District of Ohio should be the same as the definition of the practice of law employed by the Ohio Supreme Court.

*A Lawyer Who Assists a Consumer Debtor in the Preparation of a Bankruptcy Case That Can Only Be Filed in the Northern District of Ohio Is Engaged in the Practice of Law in the U.S. District Court for the Northern District of Ohio.*

Under 28 U.S.C. § 1334, federal district courts have exclusive jurisdiction over all cases under title 11 of the United States Code. Under the applicable venue provision, when a consumer debtor has resided in the same location for the last 180 days, as was the situation with both Quarm and Young, venue lies exclusively in the district where the debtor is domiciled or resides. *See* 28 U.S.C. § 1408; *Thompson v. Greenwood*, 507 F.3d 416, 424 (6th Cir. 2007) ("venue requirements of 28 U.S.C. § 1408 are mandatory, not optional"). Therefore, a lawyer who assists a consumer debtor in the preparation of a bankruptcy case that can only be filed in the Northern District of Ohio is engaged in the practice of law in the U.S. District Court for the Northern District of Ohio. *Cf. In re Babies*, 315 B.R. 785, 794 (Bankr. N.D. Ga. 2004) (practice of law before bankruptcy court included consulting with debtors and drafting bankruptcy papers); *In re Zuniga*, 332 B.R. at 779 (same).

This conclusion is buttressed by the 2005 amendments to the Bankruptcy

39

Code regulating the work of "debt relief agencies." *See* 11 U.S.C. § 101(4A),

(12A) (defining "assisted person" and "debt relief agency"); 11 U.S.C. §§ 526 -

528 (imposing various restrictions and disclosure requirements on debt relief

agencies, many of which apply to advice and assistance given in contemplation of

filing for bankruptcy); *Milavetz v. United States*, __U.S. __, 130 S. Ct. 1324, 1332

(2010) (attorneys who provide bankruptcy assistance to assisted persons are debt

relief agencies).  In *Milavetz*, the Supreme Court rejected the argument that

imposing these requirements on the legal profession impermissibly entrenches on

an area of traditional state regulation.  "Congress and the bankruptcy courts have

long overseen aspects of attorney conduct in this area of substantial federal

concern."  130 S. Ct. at 1332-33.  Accordingly, the Court holds that the practice of

law in the Northern District of Ohio encompasses not just the filing and

prosecution of consumer bankruptcy cases in this district, but the legal

representation in contemplation of filing such cases as well, including the

preparation of a debtor's petition, schedules, and statements.

*Unauthorized Practice of Law – Federal versus State*

The U.S. Trustee, Persels & Associates, and their respective experts have

focused on whether the bankruptcy representation of Quarm and Young constitutes

the unauthorized practice of law in Ohio, as opposed to the unauthorized practice

40

of law before this specific federal court. The Court makes this conclusion even though lawyers for Persels & Associates did not seek admission to the local federal bar, and arguably cannot benefit from the protection that local federal bar rules and the Sixth Circuit's decision in *Desilets* might have on conflicting state bar rules. *See In re Lucas*, 317 B.R. 195, 205 (D. Mass. 2004) (reasoning of *Desilets* does not apply because attorney was not admitted to relevant federal bar). The Court believes that the proper focus should be whether the conduct at issue is the unauthorized practice of law in this specific federal court, not the unauthorized practice of law in Ohio.

First, the attorney's fees at issue all stem from work that constitutes the practice of law in the U.S. District Court for the Northern District of Ohio, beginning with the written bankruptcy retainer agreements with Quarm and Young. *See Cincinnati Bar Assn.*, 123 Ohio St. 3d at 110, 914 N.E.2d at 389. Once the bankruptcy retainer agreements were signed, all of the work that Persels & Associates did for Quarm and Young was directed toward the preparation, filing, and prosecuting of their respective chapter 7 cases in the only jurisdiction where their cases could be filed – the U.S. Bankruptcy Court for the Northern District of Ohio. Even though Persels & Associates' lawyers were not admitted to the Northern District of Ohio, had they been admitted, or had they intended to apply

41

for admission *pro hac vice*, *Desilets* would dictate that federal bar rules would trump any claim that such conduct constitutes the unauthorized practice of law in Ohio. *See also* Rule 5.5(d)(2) of the Ohio Rules of Professional Conduct (lawyer may provide legal services in Ohio if "the lawyer is providing services that the lawyer is authorized to provide by federal . . . law"). This is because the U.S. District Court for the Northern District of Ohio does not require that lawyers also be admitted to practice in the State of Ohio. *See* N.D. Ohio Local Civil Rule 83.5(b) Nevertheless, the briefing and expert testimony as to what constitutes the unauthorized practice of law in Ohio remains relevant because the local federal bar rules themselves incorporate the Ohio Rules of Professional Conduct.

*Did Persels & Associates' Lawyers Engage in the Unauthorized Practice of Law in Representing Their Clients Quarm and Young in the Preparation, Filing, and Prosecution of Their Bankruptcy Cases in the Northern District of Ohio?*

Whether Persels & Associates' lawyers engaged in the unauthorized practice of law in representing their clients Quarm and Young in the preparation, filing, and prosecution of their bankruptcy cases in the Northern District of Ohio, depends on the outcome of several questions, including:

- Were "filing attorneys" Donnelly and Freeman in an "of counsel relationship" with Persels & Associates?

- If not, would Persels & Associates' lawyers fall within a safe harbor provision allowing lawyers not admitted in the Northern District of Ohio but admitted elsewhere, to provide legal services on a temporary basis in the

42

Northern District of Ohio?

*Were "Filing Attorneys" Donnelly and Freeman in an "Of Counsel Relationship"*
*with Persels & Associates?*

Persels & Associates asserts that, at all times pertinent to its bankruptcy

representation of Quarm and Young in the Northern District of Ohio, it was in an

"of counsel" relationship with lawyers Donnelly and Freeman, both of whom are

admitted to practice in Ohio and in the U.S. District Court for the Northern District

of Ohio. The U.S. Trustee disputes whether the arrangements between Persels &

Associates and these two lawyers constituted a true "of counsel" relationship.

*What Law Applies?*

In determining whether a true "of counsel" relationship existed, perhaps the

first question to resolve is: what law applies? A law firm headquartered in

Maryland signs separate written agreements with two lawyers admitted to practice

in Ohio and in the Northern District of Ohio for the purpose of filing separate

chapter 7 bankruptcy petitions and related papers. William Grafton, the lawyer

who coordinates the Maryland law firm's bankruptcy practice and negotiated the

written agreements with Donnelly and Freeman, is not admitted to practice in

Maryland, Ohio, or the Northern District of Ohio; however, he is admitted to the

state bars of Mississippi and Texas and the federal bar of the U.S. District Court

for the Southern District of Mississippi.

43

The short answer to this choice of law question is that the rules of the jurisdiction in which the tribunal sits govern conduct in connection with a matter pending before a tribunal – *i.e.*, the rules of the U.S. District Court for the Northern District of Ohio. The same rules would also govern conduct in anticipation of a proceeding to be filed in the Northern District of Ohio when, as is the case here, the predominant effect of such conduct is in the Northern District of Ohio. *See* N.D. Ohio Local Civil Rule 83.5. (applying Ohio Rules of Professional Conduct, so far as they are not inconsistent with federal law); Rule 8.5(b) of the Ohio Rules of Professional Conduct. Rule 8.5(b) of the Ohio Rules of Professional Conduct provides:

> **Choice of Law.** In any exercise of the disciplinary authority of Ohio, the rules of professional conduct to be applied shall be as follows:
>
> > (1) for conduct in connection with a matter pending before a *tribunal*, the rules of the jurisdiction in which the *tribunal* sits, unless the rules of the *tribunal* provide otherwise;
>
> > (2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer *reasonably believes* the predominant effect of the lawyer's conduct will occur.

From the time that Quarm and Young signed retainer agreements with Persels & Associates for the purpose of filing bankruptcy under chapter 7, it was

apparent that the bankruptcy filings would be made in the U.S. Bankruptcy Court for the Northern District of Ohio where Quarm and Young had both resided on a continuous basis for at least three years. *See* 28 U.S.C. § 1408; *Thompson*, 507 F.3d at 424 ("venue requirements of 28 U.S.C. § 1408 are mandatory, not optional"). It was also apparent that these filings would have to be made by lawyers admitted to practice law in the U.S. District Court for the Northern District of Ohio, and that the attendance of the debtors and their counsel at the meeting of creditors and any other proceedings would all be in the Northern District of Ohio. In addition, neither Donnelly nor Freeman was expected to travel to Maryland or anywhere else outside the Northern District of Ohio to meet with lawyers or other employees of Persels & Associates. Therefore, whether Donnelly and Freeman were in a true "of counsel" relationship with Persels & Associates when they signed agreements shortly before filing the *Young* and *Quarm* bankruptcy cases depends on the applicable rules of the U.S. District Court for the Northern District of Ohio.

As noted previously, the local rules of the Northern District of Ohio incorporate the Ohio Rules of Professional Conduct so far as they are not inconsistent with federal law. Several provisions of the Ohio Rules of Professional Conduct are relevant in determining what constitutes an "of counsel" relationship.

45

For example, comment [2] to the definition of "firm" or "law firm" in Rule 1.0(c)

indicates that "a lawyer in an of-counsel relationship with a law firm will be treated

as part of that firm."  In addition, comment [3] of Rule 7.5 provides:  "A lawyer

may be designated 'Of Counsel' if the lawyer has a continuing relationship with a

lawyer or law firm, other than as a partner or associate."  Also relevant is Advisory

Opinion 2008-1 issued by the Board of Commissioners on Grievances and

Discipline.  Advisory Opinion 2008-1 provides in pertinent part:

> The requirement that an "of counsel" relationship be a continuing
> relationship carried over into Ohio Rules of Professional Conduct upon
> Ohio's February 1, 2007 transition from the Ohio Code of Professional
> Responsibility. . . .

> Proper use of the professional designation "of counsel" requires a continuing
> relationship of a lawyer with a lawyer or a law firm, other than as a partner
> or associate or the equivalent of a partner or associate.  Absent the requisite
> continuing relationship with a lawyer or law firm, a lawyer's use of the title
> "of counsel" is false or misleading.

> The requisite continuing "of counsel" relationship has as its core
> characteristic a close, regular, and personal relationship other than as a
> partner or associate or the equivalent of a partner or associate, that is more
> than a mere forwarder or receiver of legal business, more than a one-time
> advisor/consultant relationship, and more than a one-case relationship.

Advisory Opinion 2008-1, at 2-3, *available at* http://www.supremecourt.ohio.gov

/Boards/BOC/Advisory_Opinions/2008//op_08-001.doc (last visited Mar. 24,

2011). Although the board's advisory opinion is informal and nonbinding, s*ee*

Rule V(2)(C) of the Rules for the Government of the Bar of Ohio; *State ex rel.*

46

*Union Cnty. Veterans Serv. Comm'n v. Parrott*, 108 Ohio St.3d 302, 305,

843 N.E.2d 750, 753 (2006), absent contrary authority, the Court believes that

Advisory Opinion 2008-1 represents the best prediction as to how the Ohio

Supreme Court would interpret the "of counsel" provisions of the Ohio Rules of

Professional Conduct.

*Neither Donnelly Nor Freeman Was in a "Close, Regular, and Personal*
*Relationship" with Persels & Associates*

The evidence in the record demonstrates that neither Donnelly nor Freeman

was in a "close, regular, and personal relationship" with Persels & Associates.

*Attorney Donnelly's Relationship with Persels & Associates*

Donnelly had no relationship with Persels & Associates until Grafton sent an

email to her on October 20, 2009, with the subject note: "Looking for local

counsel/filing attorney for Chapter 7 bankruptcy case in Cleveland area." (Quarm

Ex. 9 at 3). The text of that email message provides a candid view of the minimal

involvement expected of a local "filing attorney":

> We prepare our clients' bankruptcy petitions in-house and then send them
> out to a number of our staff/local/of counsel attorneys who then only have to
> do a review of the petition, physically file the paperwork (or electronically
> file, as the jurisdiction may require), and attend the 341 meeting.

(Quarm Ex. 9 at 3). While it is true that paragraph 5 of the written agreement

between Donnelly and Persels & Associates provides: "For the Purposes of this

and future work, Kathleen Donnelly has agreed to act as Of Counsel to the firm."
(Quarm Ex. 6), the Court disagrees with Persels & Associates' assertion that this
reference to "future work" suggests a continuing relationship beyond a single
bankruptcy case. Rather, a better reading of the agreement, based on the language
in the agreement, the representations in Grafton's email solicitation, and the
conduct of the parties to the agreement, is that the "future work" encompassed
activities in connection with Quarm's bankruptcy case beyond the specific tasks
listed in the preceding paragraph. In other words, the "future work" would be any
work in connection with Quarm's bankruptcy case beyond final review of Quarm's
chapter 7 petition and supporting schedules, obtaining Quarm's signature, filing
Quarm's chapter 7 petition and supporting schedules, and attending Quarm's
meeting of creditors. (Quarm Ex. 6 at 3).

In any event, even if Donnelly and Persels & Associates both contemplated
the possibility of similar referrals in the future, this would still not constitute a
"close, regular, and personal relationship" that would qualify as a true "of counsel"
relationship under the Ohio Code of Professional Responsibility. There is no
indication that future referrals would be handled any differently from the current
case. In other words, the future relationship suggests nothing more than an
agreement that, if Persels & Associates has another case to file in your jurisdiction,

48

it will contact you; and, if you're still interested, you can take it. Simply calling this relationship "of counsel" does not make it one. *See* Advisory Opinion 2008-1, *supra*.

*Attorney Freeman's Relationship with Persels & Associates*

While Freeman had a slightly longer relationship with Persels & Associates than did Donnelly, this relationship still falls short of the "close, regular, and personal relationship" that would qualify as a true "of counsel" relationship under the Ohio Code of Professional Responsibility. Freeman served as "filing attorney" for Persels & Associates on two occasions in 2008, performing services similar to those he performed in Young's chapter 7 case. There is no indication that Freeman ever met in person with anyone from Persels & Associates or attended any training programs or meetings with the law firm's other bankruptcy lawyers or paralegals. Once again, to simply call this relationship "of counsel" does not make it one. Indeed, if it had been a true "of counsel" relationship, Freeman would likely not have considered himself free to decline the *Quarm* case as a mere receiver of legal business. *See* Advisory Opinion 2008-1, *supra*.

*Do Persels & Associates' Lawyers Fall Within a Safe Harbor Provision Allowing Lawyers Not Admitted in the Northern District of Ohio but Admitted Elsewhere to Provide Legal Services on a Temporary Basis in the Northern District of Ohio?*

Pursuant to Local Rule 83.5 for the U.S. District Court for the Northern

49

District of Ohio, the Court will look to the Ohio Rules of Professional Conduct to determine what constitutes the unauthorized practice of law.  Since no lawyer from Persels & Associates was admitted to practice in the Northern District of Ohio, the question is whether the work in representing Quarm and Young in the preparation, filing, and prosecution of their bankruptcy cases in the Northern District of Ohio falls within one of the safe harbors of the Ohio Rules of Professional Conduct.

Rule 5.5 of the Ohio Rules of Professional Conduct governs the unauthorized practice of law in the U.S. District Court for the Northern District of Ohio, to the extent that the rule is not inconsistent with federal law.  N.D. Ohio Local Civil Rule 83.7(a).  Rule 5.5 provides in pertinent part:

RULE 5.5: UNAUTHORIZED PRACTICE OF LAW; MULTIJURISDICTIONAL PRACTICE OF LAW

(a)   A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b)     A lawyer who is not admitted to practice in this jurisdiction shall not do either of the following:

(1)   except as authorized by these rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law;

(2)  hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

(c) A lawyer who is admitted in another United States

50

jurisdiction, is in good standing in the jurisdiction in which the lawyer is admitted, and regularly practices law may provide legal services on a temporary basis in this jurisdiction if one or more of the following apply:

> (1) the services are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;

> (2) the services are *reasonably* related to a pending or potential proceeding before a *tribunal* in this or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or *reasonably* expects to be so authorized;

> (3) the services are *reasonably* related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in this or another jurisdiction, if the services arise out of or are *reasonably* related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires *pro hac vice* admission;

> (4) the lawyer engages in negotiations, investigations, or other nonlitigation activities that arise out of or are *reasonably* related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice.

(d) A lawyer admitted and in good standing in another United States jurisdiction may provide legal services in this jurisdiction in either of the following circumstances:

> (1) the lawyer is registered in compliance with Gov. Bar R. VI, Section 3 and is providing services to the employer or its organizational affiliates for which the permission of a *tribunal* to appear *pro hac vice* is not required;

> (2) the lawyer is providing services that the lawyer is authorized to provide by federal or Ohio law.

51

*Were Persels & Associates' Bankruptcy Lawyers Involved in the Northern District of Ohio on a Temporary Basis?*

Rule 5.5 of the Ohio Rules of Professional Conduct permits lawyers not admitted to practice in Ohio to engage in the practice of law in Ohio under certain circumstances provided that it is done on a "temporary basis." These exceptions do not apply if a lawyer establishes an office or other systematic and continuous presence in this jurisdiction for the practice of law. Comment [4] to Rule 5.5 of the Ohio Rules of Professional Conduct differs from the comment to the analogous ABA Model Rule. Comment [4] to Ohio Rule 5.5 provides:

> [4] Other than as authorized by law or this rule, a lawyer who is not admitted to practice generally in this jurisdiction violates division (b) if the lawyer establishes an office or other systematic and continuous presence in this jurisdiction for the practice of law. Presence may be systematic and continuous even if the lawyer is not physically present here. *For example, advertising in media specifically targeted to Ohio residents or initiating contact with Ohio residents for solicitation purposes could be viewed as a systematic and continuous presence.* Such a lawyer must not hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction. See also Rules 7.1 and 7.5(b).

(Emphasis added). The italicized sentence appears in the version of comment [4] adopted by the Ohio Supreme Court, but not in the version of comment [4] contained in the ABA Model Rule. According to the comparison provided by the Ohio Supreme Court's Task Force on Rules of Professional Conduct,

> Comment [4] is modified to warn lawyers that advertising or solicitation of Ohio residents may be considered a "systematic and continuous" presence,

52

as that term is used in division (b).

The U.S. Trustee argues that the presence of Persels & Associates in Ohio (and presumably in the Northern District of Ohio, as well) was "systematic and continuous" within the meaning of Rule 5.5 and comment [4] such that the rule's safe harbor provisions for the practice of law on a "temporary basis" are unavailable. Persels & Associates disagrees. Unfortunately, the evidence in the record on this point is not nearly as well-developed as it might have been. For example, had the U.S. Trustee provided evidence that Care One advertises or solicits business in the Northern District of Ohio, that Care One has a link to Persels & Associates on its website, that no other law firm has such a link on the Care One website, that some consideration was provided in exchange for placing the link to Persels & Associates on Care One's website, and that there was a significant sharing of services between these entities, then it might have been much easier for this Court to conclude that Persels & Associates maintains a "systematic and continuous presence" within the meaning of Rule 5.5 of the Ohio Rules of Professional Conduct. *Cf. Countrywide Homes Loans, Inc. v. McDermott (In re O'Neal)*, 426 B.R. 267 (N.D. Ohio 2010) (bankruptcy court abused its discretion when it relied on evidence not in the record in imposing sanctions against creditor sought by U.S. Trustee).

09-20498-aih    Doc 111    FILED 03/24/11    ENTERED 03/24/11 14:39:09    Page 53 of 88

Nevertheless, based solely on the evidence in the record, the Court finds, that Persels & Associates' bankruptcy lawyers are not entitled to the safe harbor exception for practice in the Northern District of Ohio on a "temporary basis" because they had a systematic and continuous presence in the Northern District of Ohio at the time Quarm and Young signed retainer agreements for filing their respective chapter 7 cases in the Northern District of Ohio. In reaching this conclusion, the Court relies on the following evidence in the record:

- Persels & Associates represented itself to clients as a "national law firm" (Ex. M at 596, Young Ex. 5 at 1);

- Wyngaard herself has performed about 50-75 bankruptcy audits or consultations for consumer debtors located in Ohio (Wyngaard Dep.. at 24) (the Court infers that approximately half of these audits or consultations involved debtors located in the Northern District of Ohio, based on statistics from the U.S. Courts showing that, in every year since at least 2004, more consumer bankruptcy cases were filed in the Northern District of Ohio than in the Southern District of Ohio. *See* U.S. Bankruptcy Courts – Business and Nonbusiness Cases Commenced by Chapter of the Bankruptcy Code, www.uscourts.gov/statistics/bankruptcystatistics.aspx (last visited Mar. 23, 2011);

- Persels & Associates filed at least two other cases in the U.S. Bankruptcy Court for the Northern District of Ohio in the calendar year before it entered into bankruptcy retainer agreements with Quarm and Young (Tr. at 133);

- the bankruptcy retainer agreements with Quarm and Young had as their sole purpose the preparation, filing, and prosecution of bankruptcy cases to be filed in the U.S. Bankruptcy Court for the Northern District of Ohio (Quarm Ex. 8 at 3; Young Ex. 9b);

- the services under the bankruptcy retainer agreements were separate and

54

distinct from the debt settlement services previously provided to Quarm and Young (Quarm Ex. 8, Ex. M; Young Ex. 5, 9).

In short, by representing itself as a national law firm with a national bankruptcy practice for consumer debtors, Persels & Associates, should not be permitted to argue that its representation of an individual debtor for his or her entire voluntary bankruptcy case constitutes only a temporary appearance before the federal court. For these debtors and their lawyers, the bankruptcy case is the *entire* reason for entering into a bankruptcy retainer agreement. *Cf. Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) (First and Fourteenth Amendments do not protect broadcaster from conversion action for broadcasting performer's entire 15-second "human cannonball" act without his permission). *But see In re Brown*, No. 09-44254, 2011 WL 477822, at*6 (Bankr. W.D. Mo. Feb. 7, 2011) (bankruptcy legal services provided to Missouri client by law firm affiliated with Persels & Associates were provided on a temporary basis within the meaning of Rule 4-5.5.(c)(1) of the Missouri Rules of Professional Conduct when manager of firm's bankruptcy practice had never before represented a client in Missouri and attorney who conducted "bankruptcy audit" had only done one prior audit of a Missouri client in the previous 18 months).

Nor does the prior representation of these debtors by other lawyers of Persels & Associates for debt settlement turn the bankruptcy retainer agreement

into a temporary offshoot of the prior representation. Unlike the initial bankruptcy consultations, the services provided under the bankruptcy retainer agreement were separate and distinct from the prior debt settlement work. As Wild, the field attorney licensed in Ohio who represented Quarm and Young under their debt settlement plans, testified: "I don't have anything to do with [these] bankruptcies. I didn't even know the clients had filed bankruptcy until [the U.S. Trustee's] subpoena arrived." (Ex. 29 at 103). Nor is this like the situation where existing counsel for a creditor agrees to take action in bankruptcy court on the creditor's behalf after a debtor's actions have forced the creditor to appear in bankruptcy court (*e.g.*, to seek relief from automatic stay). Therefore, the Court finds that Persels & Associates' bankruptcy lawyers were not involved in the Northern District of Ohio on a temporary basis.

*Even if Persels & Associates' Bankruptcy Lawyers Were Not Engaged in a Systematic and Continuous Basis in the Northern District of Ohio, the Safe Harbor Provisions of Rule 5.5 Would Not Apply.*

Persels & Associates asserts that two of the safe harbor provisions of Rule 5.5(c) of the Ohio Rules of Professional Conduct – 5.5(c)(1) and (c)(4) – permit its lawyers not admitted to practice in Ohio or the U.S. District Court for the Northern District of Ohio to work on the preparation, filing, and prosecution of the bankruptcy cases for Quarm and Young. Rule 5.5(c)(1) allows a lawyer admitted

56

in another United States jurisdiction to provide legal services on a temporary basis

if "the services are undertaken in association with a lawyer who is admitted to

practice in this jurisdiction and who actively participates in the matter." Rule

5.5(c)(4) allows a lawyer admitted in another United States jurisdiction to provide

legal services on a temporary basis if "the lawyer engages in negotiations,

investigations, or other nonlitigation activities that arise out of or are *reasonably*

related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to

practice."

*Rule 5.5(c)(1) – Services Undertaken in Association with a Lawyer Who Is Admitted to Practice in this Jurisdiction and Who Actively Participates in the Matter*

Persels & Associates asserts that Rule 5.5(c)(1) applies to the bankruptcy

work its lawyers performed for Quarm and Young because it associated with two

lawyers – Donnelly and Freeman – who are licensed to practice law in Ohio and in

the U.S. District Court for the Northern District of Ohio, and because these lawyers

actively participated in and shared responsibility for the representation of the

client. *See* Comment [8] to Rule 5.5 of the Ohio Rules of Professional Conduct.

While it is undisputed that Donnelly and Freeman actively participated and shared

responsibility in the filing and prosecution of the two bankruptcy cases once they

became involved, it is also beyond dispute that Donnelly and Freeman played no

57

role in the preparation of these debtors' petitions, schedules, and statements *before* Persels & Associates contacted them about serving as "filing attorneys" in these two cases. In other words, from July 17, 2009, when Quarm signed her bankruptcy retention agreement with Persels & Associates for the sole purpose of filing a bankruptcy case in the Northern District of Ohio, until October 20, 2009, when Grafton first contacted Donnelly, Persels & Associates never associated with anyone admitted to practice in the Northern District of Ohio with respect to Quarm's bankruptcy case. Similarly, from October 17, 2009, when Young signed his bankruptcy retention agreement with Persels & Associates for the sole purpose of filing a bankruptcy case in the Northern District of Ohio, until January 18, 2010, when Freeman entered into a contract with Persels & Associates to serve as "filing attorney" in Young's bankruptcy case, Persels & Associates never associated with anyone admitted to practice in the Northern District of Ohio with respect to Young's bankruptcy case.

The Court does not believe that this temporal arrangement falls within the safe harbor provision of Rule 5.5(c)(1). While it may not be a requirement of Rule 5.5(c)(1) that the out-of-state lawyer *immediately* associate with a lawyer admitted to practice in the jurisdiction before taking any further steps in the representation of the client, the purposes of Rule 5.5 are not served if the

58

association does not even begin until most of the out-of-state lawyer's work and interactions with the client are completed, as was the situation in both of these cases. *See* ABA Report to the House of Delegates, No. 201B (Aug. 2002), at 3-4 (regulatory interest in protecting clients and public is served when lawyer who is licensed in the jurisdiction has opportunity to oversee out-of-state lawyer's work), *available at* http://www.abanet.org/cpr/mjp/home.html (last visited Mar. 24, 2011); *but see In re Brown*, 2011 WL 477822, at *4 ("We find nothing in the rule (or common practice) that requires an attorney's constant participation to meet the active participation requirement.").

For example, in the *Quarm* and *Young* cases, if a client, lawyer, or paralegal had a question that required the expertise of a lawyer admitted to practice in the only jurisdiction where the client's bankruptcy case could be filed, the question would have to go unanswered until the out-of-state lawyer actually had an admitted lawyer with which to associate. Constant collaboration may not be required under Rule 5.5(c)(1), but the ability to collaborate with an admitted lawyer should be. Every situation may not dictate that the association be established early on. Nevertheless, the drafting of the petition, schedules, and statements in each of these consumer bankruptcy cases should not have proceeded for three full months without the ability to associate with a lawyer admitted to practice in the jurisdiction

59

where the cases had to be filed. As the Court observed in both of these cases, an experienced lawyer admitted in this jurisdiction was ultimately able to make revisions and obtain a successful outcome for each client; however, the absence of any association during the first three months of the representation significantly affected the quality of the clients' representation. Nor is this a situation where the need to associate with a lawyer admitted in the jurisdiction arose during the middle of the out-of-state lawyer's representation, since none of the lawyers who provided bankruptcy representation was involved in the debt settlement work for Quarm and Young. When Quarm and Young signed their bankruptcy retainer agreements with Persels & Associates, the firm's bankruptcy lawyers knew that someone admitted in the Northern District of Ohio had to be involved, yet the legal work for preparing, filing, and prosecuting these bankruptcy cases proceeded without an admitted lawyer to associate with for three months. Therefore, Rule 5.5(c)(1) does not apply to the bankruptcy work that Persels & Associates' lawyers and paralegals performed for Quarm and Young before associating with Donnelly and Freeman.

*Rule 5.5(c)(4) − Nonlitigation Activities that Arise out of or Are Reasonably Related to the Lawyer's Practice in a Jurisdiction in Which the Lawyer is Admitted to Practice*

Persels & Associates also asserts that Rule 5.5(c)(4) applies to the bankruptcy work its lawyers performed for Quarm and Young because the work

arose from or was reasonably related to the debt settlement work its lawyers performed in the jurisdictions in which its lawyers were admitted to practice. The Court disagrees for several reasons. First, the work that lawyers for Persels & Associates performed after it entered into bankruptcy retention agreements with Quarm and Young were not "negotiations, investigations, or other nonlitigation activities." Unlike the initial bankruptcy consultations, work performed pursuant to each bankruptcy retainer agreement had as its sole purpose the preparation, filing, and prosecution of a chapter 7 bankruptcy case. If "litigation" encompasses the preparation, filing, and prosecution of *cases* filed in federal court, then the work done for Quarm and Young constitutes litigation. *See* 28 U.S.C. § 1334 (exclusive jurisdiction for bankruptcy "cases" rests with the U.S. District Courts); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 62 (1989) (using term "bankruptcy litigation"); *Hyundai Translead Inc. v. Jackson Truck & Trailer Repair (In re Trailer Source, Inc.)*, 555 F.3d 231, 237 (6th Cir. 2009) (same). Once the bankruptcy retainer agreement was signed, Persels & Associates' lawyers and paralegals were no longer *investigating whether* to file for bankruptcy or *negotiating* debt settlement agreements with creditors. They were preparing petitions, schedules, and statements for the filing of a bankruptcy case. True, a debtor can always choose not to file after the retainer agreement is signed (and

61

presumably forfeit most, if not all, of the retainer), but the work in question is no longer just an investigation or other nonlitigation activity.

Second, the bankruptcy retainer work does not arise out of or is reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice. For example, the only activities that Wyngaard performed for Quarm and Young before she did her bankruptcy retainer work were the initial bankruptcy consultations. She had no role in their debt settlement representation. Nor did lawyers Grafton and Carullo have any role in the debt settlement representation of Quarm and Young. Their only work on behalf of these clients involved the preparation, filing, and prosecution of their clients' bankruptcy cases. The debt settlement work for Quarm and Young was done by other lawyers working as independent contractors for Persels & Associates who had no contact with their clients after the clients signed bankruptcy retainer agreements. (Ex. 29 at 67, 103). Furthermore, none of the work done for Quarm and Young by individual lawyers Grafton, Wyngaard, and Carullo is related to the jurisdictions in which these specific lawyers are admitted to practice – *i.e.*, Mississippi, Texas, and the Southern District of Mississippi for Grafton, Alaska and Wisconsin for Wyngaard, and Florida for Carullo. As Koblentz, Persels & Associates' expert witness, testified: "[L]aw firms are not subject to discipline in the State of Ohio. Only

62

particular lawyers are. . . . Each individual lawyer is responsible for him or herself." (Tr. at 429).

The Court also rejects any argument that Wyngaard's bankruptcy retainer work falls within Rule 5.5(c)(4) as arising from her prior work doing initial bankruptcy consultations. If so, any lawyer could say that he or she is in the practice of advising clients about filing for bankruptcy and then prepare the client's bankruptcy petitions, schedules, and statements for filing in any bankruptcy court in the United States without ever being admitted to a single federal court.

### Application to Quotidian Practice of Law

In holding that Persels & Associates' lawyers engaged in the unauthorized practice of law in preparing the bankruptcy petitions, schedules, and statements for Quarm and Young, the Court is cognizant of the practical concerns expressed by the Sixth Circuit in *Desilets* – namely, that any analysis involving the work of a consumer bankruptcy lawyer should also apply to lawyers doing legal work for large multistate or multinational clients. *See In re Desilets*, 291 F.3d at 930-31. The Court believes that its analysis presents no such problems for several reasons. First, its analysis is limited to situations in which a lawyer knows the specific court where the case must be filed at the time of retention. Second, in such situations, the lawyer not admitted to practice in the specific court can and should avoid any

63

problems from significant work done in connection with or in contemplation of the case by seeking admission *pro hac vice* when and if the case is filed. Third, the lawyer not admitted to practice can avoid any problems simply by associating with a lawyer who is admitted to practice *before* engaging in substantial work on the case.

### *"Reasonable" Attorney's Fees under the Bankruptcy Code*

The Bankruptcy Code requires bankruptcy courts to evaluate the reasonableness of attorney's fees in several circumstances. *See, e.g.*, *Rittenhouse v. Eisen*, 404 F.3d 395, 397 (6th Cir. 2005) ("[Section 329] requires the bankruptcy court to evaluate the reasonableness of the fee arrangement [between the debtor and the debtor's attorney]."); *United States v. Schilling (In re Big Rivers Elec. Corp.)*, 355 F.3d at 432 (noting that section 330 provides that examiners, trustees, professionals employed under section 327 (including lawyers) "may receive only 'reasonable compensation' "); *Peale v. Miller*, No. 95-5681, 1996 U.S. App. LEXIS 31260 (6th Cir. Nov. 27, 1996) (unpublished) (section 502(b)(4) limits claims by an attorney to the reasonable value of the attorney's services); *see also In re Gutierrez*, 309 B.R. at 492 ("Section 502(b)(4) permits disallowance of a pre-petition claim for attorney's fees if those fees are found to be unreasonable.").

In the federal courts, the "lodestar" method, which multiplies a reasonable

09-20498-aih    Doc 111    FILED 03/24/11    ENTERED 03/24/11 14:39:09    Page 64 of 88

hourly rate by the number of hours reasonably expended, is the appropriate calculus for determining "reasonable compensation." *See Boddy v. Golden, (In re Boddy)*, 950 F.2d 334, 338 (6th Cir. 1991) ("[B]ankruptcy courts must expressly calculate the lodestar amount when determining reasonable attorney's fees."). Section 330, however, provides that courts shall consider "all relevant factors" in determining "reasonable compensation." *Accord In re Boddy*, 950 F.2d at 338 (noting that, in addition to the lodestar method, a court "may exercise its discretion to consider other factors such as the novelty and difficulty of the issues, the special skills of counsel, the results obtained, and whether the fee awarded is commensurate with fees for similar professional services in non-bankruptcy cases in the local area"); *see also In re Big Rivers Elec. Corp.*, 355 F.3d at 432 ("Reasonable compensation for services necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act." (*quoting Woods v. Nat'l Bank & Trust Co.*, 312 U.S. 262, 268-69 (1941))). While the several "reasonable value" or "reasonable compensation" provisions of the Bankruptcy Code apply in different situations, the Court believes that these provisions, as well as the Sixth Circuit cases interpreting those sections, should be read to employ a consistent standard for determining the reasonableness of attorney's fees. *See In re Nelson*, 206 B.R. 869, 882 (Bankr. N.D. Ohio 1997)

("Although these factors were employed to determine 'reasonable compensation' pursuant to 11 U.S.C. §§ 327 and 330, they are useful criteria to a determination of reasonable value pursuant to 11 U.S.C. § 502(b)(4)."); *see also City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) ("case law construing what is a 'reasonable fee' applies uniformly to all" federal fee-shifting statutes using the term). Thus, whether a court is determining the reasonableness of fees under section 329, section 330, or section 502(b)(4), the court may consider "all relevant factors," but the court's benchmark for determining the reasonableness of fees is obtained by the lodestar method.

### Review of Attorney's Fees Paid to Persels & Associates

As noted previously, if Persels & Associates performed services for Quarm and Young that constitute the unauthorized practice of law, case law would support the availability of disgorgement, notwithstanding the otherwise beneficial nature of the services and positive outcome for the debtors. A bankruptcy court has wide discretion in determining reasonable compensation. *See In re Kisseberth*, 273 F.3d at 721.

The evidentiary record in these two cases provides little information to assist the court in conducting a traditional lodestar analysis. Persels & Associates provided no contemporary time records, little information about the normal billing

rates for its lawyers and paralegals, and only the most generalized estimates of time spent by its lawyers and paralegals in these two cases. *Cf.* General Order 93-1 "Guidelines for Compensation and Expense Reimbursement of Professionals." For example, Grafton estimated that, excluding Donnelly's work as "filing attorney," lawyers for Persels & Associates spent 5 1/2 - 6 hours working on Quarm's bankruptcy case. (Tr. at 360-61). He also estimates another 5 - 6 hours of staff time. (Tr. at 360-61). In addition, Grafton estimated that, excluding Freeman's work as "filing attorney," Persels & Associates spent 4 - 5 hours of attorney time and 4 - 5 hours of staff time working on Young's bankruptcy case. (Tr. at 381-82). Plus, Grafton's statement to Donnelly that he "personally prepared" the paperwork for filing in Quarm's case, (Ex. 9 at 3), is inconsistent with contemporary records that paralegal Lori Orth initially drafted the paperwork for Quarm. (Ex. B at 28, 31).

Furthermore, it is unclear whether these estimates include time spent conducting the initial bankruptcy consultations, which occurred before Quarm and Young entered into their bankruptcy retainer agreements with Persels & Associates. It appears that the attorney's fees, if any, for the initial bankruptcy consultations provided to Quarm and Young were not included in the flat fees that Persels & Associates charged as part of its bankruptcy retainer agreements.

67

Rather, the initial bankruptcy consultations appear to have been included as part of the firm's debt settlement services. Nor does the U.S. Trustee appear to challenge the reasonableness of attorney's fees for services included as part of the debt settlement representation provided to Quarm and Young before they signed their bankruptcy retainer agreements. (Tr. at 538). The Court also notes that the U.S. Trustee has stipulated that the total fees charged in the *Quarm* and *Young* cases fall within the spectrum of what may be charged in the Northern District of Ohio for chapter 7 consumer bankruptcy cases. (Tr. at 447-48).

In addition to this sparse record of billing hours and customary billing rates, the Court notes that Persels & Associates paid the paralegals a flat rate of $75 per case for all of their work and did so on an independent contract basis. Similarly, Persels & Associates paid the audit lawyers a flat rate of $150 per case for all of their work and did so on an independent contract basis as well.

### *Reasonable Attorney's Fees in* Quarm

Taking into account the limited lodestar evidence and all relevant factors, the Court concludes that a reasonable attorney's fee for Persels & Associates in the *Quarm* case is $600, excluding the $400 that Persels & Associates shared with Donnelly. The Court notes that, had Donnelly taken Quarm's case from the beginning, she would have charged only $800, plus the separate $400 for filing a

68

motion to redeem and associated refinancing. (Persels & Associates' own fee did not include any redemption-related services). Donnelly also charged Quarm $300 to file a motion to vacate a judgment lien that was recorded on October 19, 2009. Had Persels & Associates moved more quickly in preparing Quarm's case for filing, that motion and the associated attorney's fees would likely have been unnecessary. The evidence reflects that Persels & Associates was aware of Quarm's desire to file as soon as possible, (Ex. B), yet the firm's failure to have a lawyer admitted to practice in the court where Quarm's case had to be filed led to a delay that caused Quarm to incur additional expenses unnecessarily. In addition, even if Grafton is correct in estimating the number of hours spent by the firm's lawyers and staff, the Court will disallow time spent trying to locate a "filing attorney" admitted to practice in the Northern District of Ohio, as well as time that resulted from an otherwise unnecessary division of responsibility or duplication of effort. Putting aside the $400 for filing the motion to redeem and associated refinancing, Quarm spent $1,700 in attorney's fees -- $1,400 paid to Persels & Associates, of which $400 went to Donnelly, plus the $300 that Quarm paid Donnelly to remove a judgment lien that would likely not have been filed had the firm moved more expeditiously in filing Quarm's case. The Court therefore orders Persels & Associates to disgorge $700 in attorney's fees as excessive under

69

11 U.S.C. § 329 and Rule 2017.

*Reasonable Attorney's Fees in* Young

Taking into account the limited lodestar evidence and all relevant factors, the Court concludes that a reasonable attorney's fee for Persels & Associates in the *Young* case is $750, excluding the $450 that Persels & Associates shared with Freeman. The Court notes that there was no testimony concerning what Freeman would have charged had he represented Young by himself from the beginning. Unlike the situation in *Quarm*, Young incurred no additional attorney's fees beyond the $1,500 paid to Persels & Associates (including the $450 that Persels & Associates shared with Freeman). Nor is there any indication that the *Young* case incurred a delay like the *Quarm* case because of the need to find a local lawyer to file the case. Given the limited lodestar evidence, the Court estimates that the firm's failure to have a lawyer admitted to practice in the Northern District of Ohio at the time Young signed his bankruptcy retainer agreement resulted in at least $300 in billing time caused by this otherwise unnecessary division of responsibility or duplication of effort. Young spent $1,500 in attorney's fees, of which $450 went to Freeman. The Court therefore orders Persels & Associates to disgorge $300 in attorney's fees as excessive under 11 U.S.C. § 329 and Rule 2017.

*Even If Persels & Associates' Lawyers Did Not Engage in the Unauthorized Practice of Law, Partial Disgorgement Is Appropriate because of the Failure to Disclose to Quarm and Young at the Time of the Bankruptcy Retainer Agreement That No One in the Law Firm was Admitted to Practice in the Bankruptcy Court Where Their Cases Were to Be Filed and because of the Resulting Extra Work and Delay Caused by this Otherwise Unnecessary Duplication of Effort*

Comment [20] to Rule 5.5 of the Ohio Rules of Professional Conduct is particularly apt to the present situation.  It provides:

> In some circumstances, a lawyer who practices law in this jurisdiction pursuant to divisions (c) or (d) may have to inform the client that the lawyer is not licensed to practice law in this jurisdiction. For example, that may be required when the representation occurs primarily in this jurisdiction and requires knowledge of the law of this jurisdiction. See Rule 1.4(b).

Rule 1.4(b) of the Ohio Rules of Professional Conduct provides:

> A lawyer shall explain a matter to the extent *reasonably* necessary to permit the client to make informed decisions regarding the representation.

When Quarm and Young signed their written bankruptcy retainer agreements, they were hiring Persels & Associates for the sole purpose of preparing, filing, and prosecuting their prospective chapter 7 bankruptcy cases in the only jurisdiction where their cases could be filed – the U.S. Bankruptcy Court for the Northern District of Ohio.  Such representation occurs exclusively in the Northern District of Ohio and requires knowledge of the law (*e.g.*, Ohio exemption laws) particular to the jurisdiction.  To make an informed decision at the time the client decides to sign the representation agreement, a client should know whether

71

the law firm has the present legal ability to represent the client for the services being contracted. *See* Rule 1.4(b) of the Ohio Rules of Professional Conduct. A client that hires what purports to be a "national" law firm to file a consumer bankruptcy case should be told up front if there is no one presently employed who is admitted to practice in the bankruptcy court where the client's case is to be filed. That Persels & Associates may later associate with or contract with a filing attorney admitted to practice in the U.S. Bankruptcy Court to assist in a final review of the papers to be filed and handle the filing and any personal appearances in the case is simply insufficient. Nor was it sufficient for Persels & Associates to disclose to the client that the client's case "may be filed by an attorney acting as 'Of Counsel' to Persels & Associates, LLC or by an independently contracted attorney." There is a significant difference between "someone else may assist us with the filing of your bankruptcy case" and "no one in our law firm is admitted to practice in the bankruptcy court where your case is to be filed."

Section 329 of the Bankruptcy Code, Rule 2017 of the Federal Rules of Bankruptcy Procedure, and case law provide ample authority for ordering the disgorgement of attorney's fees paid by a debtor if such compensation exceeds the reasonable value of any such services. *See Rittenhouse*, 404 F.3d at 397 (judge must ensure reasonableness by recouping debtor's prepaid fees which exceed the

72

reasonable value of the legal services); *In re Kisseberth*, 273 F.3d at 720 ("Under Rule 2017, the bankruptcy may determine, after notice and a hearing, that any portion of an attorney's fee for work in a bankruptcy case is excessive.").

At the time that Quarm and Young signed their bankruptcy retention agreements, no one at Persels & Associates was admitted to practice in the bankruptcy court where their cases were to be filed. The failure of Persels & Associates to disclose this fact was an important omission because the need to obtain a local "filing attorney" inevitably resulted in a delay in filing and a duplication in services, as another attorney needed to become familiar with the debtor's case and coordinate his or her efforts with individuals who had previously drafted the debtor's petition, schedules, and statements but were not licensed to practice in the Northern District of Ohio and were not as familiar with the laws and local requirements particular to this jurisdiction.

For example, Quarm had her final bankruptcy audit on September 24 and 29, 2009 (Tr. at 41; Ex. B), but Grafton did not contact Donnelly until October 20, 2009. (Tr. at 51; Quarm Ex. 9). When Quarm finally met with Donnelly on November 4, 2009, Donnelly was able to make the appropriate changes and file Quarm's bankruptcy case while Quarm was still in Donnelly's office. (Tr. at 59). Donnelly testified that, had she represented Quarm from the beginning, she would

have been able to handle the whole case herself for her standard fee of $800, (Tr. at 74), significantly less than the $1,400 that Persels & Associates charged Quarm for its assortment of lawyers and paralegals, working as independent contractors from various remote locations throughout North America. Similarly, Wyngaard conducted Young's final bankruptcy audit on January 13, 2010, and sent a copy of Young's draft petition, schedules, and statements to Freeman, the prospective "filing attorney," on January 20, 2010. After a number of email and other communications, Freeman, Wyngaard, and Young went through various revisions of the draft filings until Freeman filed Young's bankruptcy case on February 25, 2010. All the delay from this division of responsibility would have been unnecessary had Freeman handled the case himself, or had Persels & Associates employed someone admitted to practice in the Northern District of Ohio from the time Young signed the bankruptcy retention agreement with Persels & Associates in October 2009.

Accordingly, even if Persels & Associates' lawyers did not engage in the unauthorized practice of law, the partial disgorgement previously discussed is a sufficient sanction for failing to disclose to Quarm and Young at the time of the bankruptcy retainer agreement that no one in the law firm was admitted to practice in the bankruptcy court where their cases were to be filed and for the resulting

74

extra work and delay caused by this otherwise unnecessary duplication of effort. *See* 11 U.S.C. § 329; Fed. R. Bankr. P. 2017.

*Disgorgement and Other Sanctions under the Court's Inherent Powers*

If Persels & Associates' lawyers engaged in the unauthorized practice of law before this Court, disgorgement or other sanctions may also be appropriate under the Court's inherent powers, separate and apart from section 329 of the Bankruptcy Code. *See In re Downs*, 103 F.3d at 477 ("Bankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct."). A Court must be careful when considering whether to impose sanctions. "When a court metes out a sanction, it must exercise such power with restraint and discretion." *Id.* at 478 (*citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "The sanction levied must thus be commensurate with the egregiousness of the conduct." *In re Downs*, 103 F.3d at 478.

Assuming this decision is not overturned on appeal, the Court is confident that its holding, along with the disgorgement ordered above pursuant to 11 U.S.C. § 329 and Rule 2017, will be sufficient to vindicate the U.S. Trustee's position and to effect a change in the practices of Persels & Associates in any future cases filed in the Northern District of Ohio. *See In re Brown*, 2011 WL 477822, at *8-9, 13 (declining to impose disgorgement despite technical violation of federal bar

requirement because lawyers could have avoided the violation by moving for admission to federal court *pro hac vice*, but directing law firm and its affiliates to seek admission *pro hac vice* in the future). *Cf.* Fed. R. Bankr. P. 9011(c)(2) (sanction imposed under Rule 9011 "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."). For example, it appears that Persels & Associates has recently taken some steps to retain bankruptcy lawyers, who are admitted to practice in the bankruptcy court where a client's case must be filed, earlier in the process. Persels & Associates may also decide to have its initial bankruptcy consultations done by lawyers admitted to practice in the bankruptcy court where the client's case would be filed. If such lawyers were in a true "of counsel" relationship with Persels & Associates, (*i.e.*, close, regular, and personal), Persels & Associates would avoid the type of delay observed in *Quarm*, when the firm scrambled to find a "filing attorney" admitted to practice in the Northern District of Ohio. Of course, Persels & Associates might have to pay such experienced bankruptcy lawyers more than the $18.50 per file that it paid Wyngaard for her initial bankruptcy consultations with Quarm and Young.

The Court concludes that no further sanctions are warranted beyond the disgorgement previously discussed. Among the reasons the Court finds that

further sanctions are not needed are:

- the absence of any prior determination by a court or disciplinary authority that the business model of Persels & Associates for representing consumer debtors, including the practice of "employing" local lawyers as "of counsel," constitutes the unauthorized practice of law;

- the significant attorney's fees that Persels & Associates has itself incurred in defending the motions of the U.S. Trustee;

- the successful outcomes for Quarm and Young, both of whom received a chapter 7 discharge; and

- that Persels & Associates' lawyers could have eliminated the problem by intending to seek admission *pro hac vice* in the *Quarm* and *Young* cases.

Accordingly, the Court concludes that no additional sanctions are warranted under the Court's inherent powers for the unauthorized practice of law before this Court.

### *Compliance with Fee Disclosure Requirements of 11 U.S.C. § 329(a) and Rule 2016(b) of the Federal Rules of Bankruptcy Procedure*

The U.S. Trustee argues that disgorgement of attorney's fees is also warranted because Persels & Associates did not adequately disclose its fee arrangements as required under 11 U.S.C. § 329(a) and Rule 2016(b) of the Federal Rules of Bankruptcy Procedure. Under 11 U.S.C. § 329(a):

> Any attorney representing a debtor in a case under this title . . . shall file with the court a statement of the compensation paid or agreed to be paid . . . for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

In addition, Rule 2016(b) provides:

77

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

"An attorney in a bankruptcy case has an affirmative duty to disclose fully and completely all fee arrangements and payments." *In re Kisseberth*, 273 F.3d at 720. "[B]ankruptcy courts have broad and inherent authority to deny any and all compensation where an attorney fails to satisfy the requirements of the Code and Rules." *Id.* at 721. " 'Even a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all requested fees.' " *Id.* (*quoting Neben & Starrett, Inc. v. Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 882 (9th Cir. 1995)).

The Court finds that the Rule 2016(b) fee disclosure statements in these two cases were technically deficient, with any deficiencies largely inadvertent, and that, overall, the disclosures substantially complied with the requirements of section 329(a) and Rule 2016(b). In the *Quarm* case, the Rule 2016 disclosure signed by Donnelly and Quarm disclosed an attorney's fee of $1,400 and identified the fee

sharing arrangement as follows:

> Persels & Associates LLC sent $400.00 for attorney fees for Kathleen Donnelly to represent Ms. Quarm at court and file the petition and the $299.00 for the court filing fee.

(Quarm Ex. 2 at 41). Quarm's Statement of Financial Affairs also disclosed the $1,400, $200 in expenses, and $299 filing fee paid to Persels & Associates in July 2009, and the $400 in attorney's fees and $299 filing fee that Persels & Associates forwarded to Donnelly. (Quarm Ex. 2 at 33).

In the *Young* case, the Rule 2016(b) statement was signed by Freeman as "of counsel" to Persels & Associates and disclosed an attorney fee of $1,998, including the $299 filing fee. (Quarm Ex. 12 at 37). The typed disclosure indicated that none of the fee was being shared, but a handwritten note that Freeman added to the form states: "* including $400 paid to Greg Freeman 'of counsel.' " (Quarm Ex. 12 at 37). However, Freeman testified that he was actually paid $450. (Tr. at 146). Young's Statement of Financial Affairs also disclosed the $1,998 total, including $1,500 in legal fees, $200 in expenses, and $299 filing fee paid to Persels & Associates on October 21, 2009, plus a handwritten note that Freeman added stating: "(Including $400 to Greg Freeman of counsel.)" (Tr. at 30).

While these disclosures provide the gist of the actual fee arrangements and payments, separate disclosures are technically required for attorneys from separate

79

law firms. *See* Comment [2] to Rule 1.0 of the Ohio Rules of Professional Conduct; Advisory Opinion 2008-1 issued by the Board of Commissioners on Grievances and Discipline. If Donnelly and Freeman were in a true "of counsel" relationship with Persels & Associates, no separate disclosures or fee sharing arrangements would be required. *See id.*; *see also* Rule 1.5(d)(2) of the Ohio Rules of Professional Conduct. Nevertheless, because this Court has determined that Donnelly and Freeman were not in a true "of counsel" relationship with Persels & Associates, separate disclosures should have been made. Given that this is the first court determination of an absence of a true "of counsel" relationship, and given substantial compliance with the disclosure requirements of Rule 2016(b), the Court finds that no further disgorgement is warranted as result of any noncompliance with 11 U.S.C. § 329(a) and Rule 2016(b). *Accord In re Brown*, 2011 WL 477822, at *11-13 (declining to impose disgorgement despite technical violation of Rule 2016(b) but directing law firm and its affiliates to file a separate Rule 2016 disclosure of compensation in the future).

*Application of Petition Preparer Requirements of 11 U.S.C. § 110*

The U.S. Trustee also seeks disgorgement of fees and sanctions under the theory that the work performed by individuals at Persels & Associates on behalf of Quarm and Young also makes such persons "bankruptcy petition preparers" as

80

defined by section 110 of the Bankruptcy Code. Section 110(a) defines a "bankruptcy petition preparer" as "a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing." While this definition appears to exclude "an attorney for the debtor," the definition of "attorney" in 11 U.S.C. § 101(4) is limited to an "attorney, professional law association, corporation, or partnership, *authorized under applicable law to practice law*." (emphasis added). To the extent that lawyers at Persels & Associates performed work for Quarm and Young that constitutes the unauthorized practice of law, such persons would, by definition, be "persons other than an attorney [authorized under applicable law to practice law] who prepares for compensation a document for filing" – *i.e.*, a "bankruptcy petition preparer" as defined by section 110 of the Bankruptcy Code. In addition, paralegals and other non-lawyer employees of Persels & Associates who performed work for Quarm and Young would also be "bankruptcy petition preparers" unless they were "under the direct supervision of [an attorney authorized under applicable law to practice law]." 11 U.S.C. §§ 101(4) and 110(a).

Presumably, Grafton, Wyngaard, or Carullo provided at least some supervision of the paralegals and other non-lawyer employees of Persels & Associates who helped prepare documents for filing on behalf of Quarm and

81

Young in the U.S. Bankruptcy Court for the Northern District of Ohio. Certainly, Donnelly and Freeman did not directly supervise any non-lawyer employees of Persels & Associates. Therefore, unless Grafton, Wyngaard, or Carullo was "authorized under applicable law to practice law" within the meaning of 11 U.S.C. § 101(4), the work of the paralegals and other non-lawyer employees to prepare Quarm and Young's bankruptcy documents would constitute the work of "bankruptcy petition preparers" under 11 U.S.C. § 110(a).

As noted previously, in *Desilets* the Sixth Circuit construed 11 U.S.C. § 101(4) and held that the "applicable law" authorizing an attorney to practice before the bankruptcy court consists of the federal rules for admission to the federal bar. *See In re Desilets,* 291 F.3d at 931 ("federal standards govern practice before the federal bar"). The question is – were these lawyers authorized to practice law in the U.S. District Court for the Northern District of Ohio? – a question this Court has already answered in the negative.

While the bankruptcy work for Quarm and Young by lawyers at Persels & Associates not authorized to practice law in the Northern District of Ohio technically constitutes the work of "bankruptcy petition preparers," these technical violations of the provisions of 11 U.S.C. § 110 and the $125 presumptive maximum fee for petition preparers in General Order 05-3 are simply the automatic

consequences for any lawyer who is found to have engaged in the unauthorized practice of law. The Court believes that 11 U.S.C. § 110 was not intended to apply to such situations. *See* 11 U.S.C. § 110(b)(2)(B)(1) and Official Form B-19 (requiring petition preparer to inform the debtor in simple language "that a bankruptcy petition preparer is not an attorney and may not practice law or give legal advice"); *Milavetz v. United States*, __U.S. __, 130 S. Ct. 1324, 1332 (2010) (noting that the definition of "bankruptcy petition preparer" in 11 U.S.C. § 110(a) "excludes attorneys and their staff").

In *Milavetz*, the Supreme Court only made a passing reference to section 110 and presumably did not contemplate a situation in which a lawyer not authorized to practice law might fall within the literal definition of a bankruptcy petition preparer. Indeed, the passing reference to section 110 in *Milavetz* supports this Court's own conclusion that section 110 was not designed for the situation at issue in these two cases. Rather, 11 U.S.C. § 110 was intended to address situations where a non-lawyer does work as a "bankruptcy petition preparer," as opposed to situations where an attorney of record, who substantially complies with the disclosure requirements of 11 U.S.C. § 329 and Rule 2016, is for some reason not authorized to practice law. An example of the latter would be a lawyer whose admission to practice in the federal court may have lapsed because of non-payment

83

of registration fees or the failure to meet ongoing continuing legal education requirements. In such situations, a bankruptcy court's broad authority to review fee arrangements between the debtor and the attorney provides a more appropriate mechanism than application of 11 U.S.C. § 110. *See Milavetz*, 130 S. Ct. at 1332-33 (noting broad authorization for courts to examine the reasonableness of a debtor's prepetition attorney's fees).

On the other hand, the provisions of 11 U.S.C. § 110 may well be appropriate when a lawyer for compensation helps a debtor prepare documents for filing but does not sign the documents as the debtor's attorney and fails to make any of the disclosures required under Rule 2016(b), provided the lawyer is not authorized to practice law in the federal court where the bankruptcy case is filed. For example, if Persels & Associates had offered to prepare for compensation bankruptcy petitions, schedules, and statements for prospective *pro se* debtors who would file their own papers and represent themselves in court – similar to the law firm's practice of not appearing in court on behalf of its debt settlement clients, then the provisions and accompanying sanctions for "bankruptcy petition preparers under 11 U.S.C. § 110 and General Order 05-2 may be appropriate.

Here, however, there was substantial compliance with the provisions of Rule 2016, and the unauthorized practice of law could have been avoided by the

84

timely filing of motions to appear *pro hac vice*. Therefore, the Court does not believe that it would be appropriate to impose additional sanctions that, in theory, might be available against bankruptcy petition preparers under 11 U.S.C. § 110 and General Order 05-2. Accordingly, the Court declines to impose additional sanctions that might be available under 11 U.S.C. § 110 and General Order 05-2.

### An Apparent Absence of "Direct Supervision"

In one respect, however, the petition preparer provisions of 11 U.S.C. § 110 may apply to Persels & Associates' current bankruptcy practice – namely, the bankruptcy work done by the firm's paralegals and other non-attorney employees. When Congress amended the definition of "bankruptcy petition preparer" in 2005, it no longer excluded "an attorney or an employee of an attorney." Rather, the exclusion is now limited to "an attorney for the debtor or an employee of such attorney *under the direct supervision of such attorney*." 11 U.S.C. § 110(a) (emphasis added).

The evidence before the Court suggests that no attorney directly supervised the paralegals, Brienne Barnes located in Tennessee and Lori Orth located in Colorado, who initially drafted the bankruptcy petitions, schedules, and statements for Quarm and Young respectively. True, the final work product of the paralegals and other non-lawyers was reviewed by an "audit attorney" as well as a "filing

85

attorney" who also signed the documents filed with the court. But the Court is unconvinced that this review of paperwork at the end of a process extending over several months constitutes "direct supervision" as used in section 110(a).

For example, it appears that Wyngaard, who resides in Mexico, may have provided some supervision of bankruptcy paralegals, but Wyngaard indicated that she does not normally have any involvement between the initial consultation and the audit. (Wyngaard Dep. at 44-45). It also appears that some of the paralegals working on behalf of Persels & Associates are independent contractors working remotely from locations other than Persels & Associates' office in Maryland. Although Grafton testified that he supervised the firm's bankruptcy paralegals, the internal logs associated with these two cases indicate little contact between Grafton and paralegals Barnes and Orth. (Tr. at 311-13; Ex. B, D). Unfortunately, neither the U.S. Trustee nor Persels & Associates provided much evidence relevant to this issue.

Nevertheless, the Court believes that its comprehensive review of the reasonableness of the attorney's fees charged to Quarm and Young, discussed previously, has already taken into account the deficiencies that have caused this Court to question whether this work was under the "direct supervision" of an attorney. Essentially, the same practices at Persels & Associates that diminished

86

the quality of the firm's bankruptcy representation of Quarm and Young also suggest that the firms paralegals may be "bankruptcy petition preparers" due to the absence of "direct supervision" by an attorney, let alone the "direct supervision" of an attorney authorized to practice law in the jurisdiction where the bankruptcy case is to be filed. *See* 11 U.S.C. §§ 101(4); 110(a). Therefore, no additional reduction in attorney's fees is warranted under 11 U.S.C. § 110 or General Order 05-2 .

### *U.S. Trustee's Request for Accounting of Young's Debt Settlement Fees*

The U.S. Trustee's motion also seeks an accounting of the debt-settlement fees that Young paid to Persels & Associates in the period leading up to his filing for bankruptcy on February 25, 2010. During the evidentiary hearing, Grafton provided a chronological history of the work that Persels & Associates performed in connection with Young's debt settlement plan, using as a reference a printout from the firm's computer software, which was intended to log each activity *e.g.*, phone call, email, payment, etc. (Tr. at 370-375; *see also* Ex. K). The Court is satisfied that this testimony provides an adequate accounting of the debt settlement work that Persels & Associates performed for Young. Accordingly, to the extent that the U.S. Trustee seeks an accounting beyond the testimony provided by Grafton, the motion is denied.

87

CONCLUSION

For the foregoing reasons, the U.S. Trustee's motions seeking the disgorgement of attorney's fees the debtors paid to Persels & Associates and other relief is granted in part and denied in part.  Persels & Associates is ordered to make a partial disgorgement of attorney's fees in the amount of $700 in the *Quarm* case and $300 in the *Young* case.  Payment shall be made to the Clerk of the U.S. Bankruptcy Court for the Northern District of Ohio within 21 days of the date of this decision.  Once the payment has been made to the Clerk, the Clerk is authorized to pay $700 to Quarm and $300 to Young as partial reimbursement for their attorney's fees.  Additional relief requested by the U.S. Trustee is denied. Each party shall bear its own costs and attorney's fees.

IT IS SO ORDERED.